# John Charbonneau v. John Gorczyk

[838 A.2d 117]

No. 01-312

Present: Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned[1]

Opinion Filed November 7, 2003

*Matthew Valerio*, Defender General, *Seth Lipschutz*, Prisoners' Rights Office, and *Michal Mokryn*, Legal Intern, Montpelier, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, Montpelier, and *Nicole Andreson*, Assistant Attorney General, Waterbury, for Defendant-Appellee.

---

[1] This case was heard originally in March 2002 before Justice James L. Morse retired from the Court. The parties agreed to waive oral argument after retired Chief Justice Frederic W. Allen agreed to substitute for Justice Morse following Justice Morse's retirement.

¶ 1. **Amestoy, C.J.** Plaintiff John Charbonneau appeals a decision by the Orleans County Superior Court dismissing his claim against John Gorczyk, Commissioner of the Vermont Department of Corrections (DOC) for discrimination under Title II of the Americans with Disabilities Act (ADA). Following a bench trial, the trial court concluded that (1) plaintiff is not "disabled" under the ADA, and (2) if plaintiff is disabled, his requested modifications to accommodate the disability are unreasonable. We affirm the court's decision that plaintiff is not disabled within the meaning of the ADA, and therefore we find it unnecessary to determine the reasonableness of plaintiff's requested accommodations.

¶ 2. The facts presented at trial were essentially undisputed. At issue here is whether the facts support the trial court's legal conclusions. Our standard of review on questions of law is de novo. *State v. Pollander*, 167 Vt. 301, 304, 706 A.2d 1359, 1360 (1997). We now turn to the facts as found by the trial court.

¶ 3. Plaintiff is a prisoner at the Northern State Correctional Facility (NSCF). He suffers from Prinz-Metil angina, a heart condition that causes intermittent, involuntary spasms of the coronary artery, restricting blood flow to the heart. The spasms are unpredictable and are not necessarily caused by stress or overexertion. People with this condition can suffer spasms even at rest. When these spasms occur, plaintiff experiences acute pain, and he must take three nitroglycerin tablets over a fifteen minute period. If the pain persists despite the medication, more intensive medical intervention is necessary to diagnose the potential for a heart attack. Timely medical care following a spasm is essential to successfully monitor and manage plaintiff's condition.

¶ 4. While incarcerated, plaintiff has experienced sixteen of these episodes. One of those sixteen episodes required a hospital visit. At the time of trial, plaintiff was housed at NSCF, a facility with a nurse on duty twenty-four hours per day.

¶ 5. Although most individuals who suffer from Prinz-Metil angina must live in an area where they have access to medical care, many can live and work in the community with few, if any, residence, travel, or work restrictions. Thus, plaintiff has been able to work while in prison, performing janitorial and laundry services. For his work, plaintiff has received earned reductions in his term (ERT).

¶ 6. Seeking additional ERT, plaintiff asked for a transfer to a prison work camp in St. Johnsbury. The work camp is a special prison facility that houses a small number of inmates. It provides a program whose mission is rehabilitation through community service. Inmates at the camp receive additional ERT, reducing their sentences at a faster rate than

inmates at other facilities, like NSCF. DOC officials denied plaintiff's transfer request because he was not medically qualified for the program due to the lack of full-time medical coverage necessary to monitor and mange his Prinz-Metil angina. Plaintiff grieved the denial to the DOC. He requested to attend the work camp or, in the alternative, to receive the additional ERT he would receive at the work camp while remaining at NSCF. Prison officials denied his grievance.

¶ 7. Following the prison's denial of his grievance, plaintiff filed suit in Orleans Superior Court on November 7, 2000. At trial, he argued that under the ADA he should either be given access to the work camp or receive the additional ERT he would have earned at the camp. Following a bench trial, the Orleans Superior Court dismissed plaintiff's claims, finding that he is not disabled under the ADA because his impairment does not substantially affect his ability to work in a broad range of jobs. The court also found that even if plaintiff were disabled within the meaning of the ADA, his request to attend the work camp could not be made without undue hardship to the DOC. This appeal followed.

■ ¶ 8. This case is governed by Title II of the ADA, which prohibits state agencies like the DOC from excluding an individual from a DOC program because of the individual's disability. See 42 U.S.C. § 12132 (1995) (forbidding disability discrimination by states). A person is disabled if the person (1) has a "physical or mental impairment," (2) "that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A) (1995). Under the regulations implementing Title II of the ADA, to which we must accord great deference, *Bartlett v. N.Y. State Bd. of Law Examiners*, 226 F.3d 69, 79, 82 (2d Cir. 2000), a substantial limitation is established "when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. Pt. 35, App. A § 35.104 (2003); see also *Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 626-27 (6th Cir. 2000) (DOJ regulations require comparison of plaintiff's limits to those of general population). To be "disabled," a causal nexus must exist between the impairment and the substantial limitation of the major life activity at issue. *Bartlett*, 226 F.3d at 84-85. "In other words, the definition of 'disability' . . . encompasses the requirement that it be the impairment, and not some other factor or factors, that causes the substantial limitation." *Id.*

¶ 9. In this case, there is no dispute that Prinz-Metil angina is a physical impairment. At issue is whether plaintiff's impairment substantially limits a major life activity. The major life activity the parties contest is plaintiff's ability to work. Thus, a determination of whether plaintiff is

disabled within the meaning of the ADA turns on whether his working ability is substantially limited by his Prinz-Metil angina rather than some other factor. The trial court found that plaintiff's heart condition is *not* one which normally limits, in a meaningful way, a person's capacity to work. Many persons with Prinz-Metil angina live and work with few, if any, restrictions. Plaintiff's condition has not affected any of his day-to-day activities, nor interfered with his ability to perform laundry and janitorial jobs at the prison. In fact, plaintiff held a position in the prison laundry at the time he testified in this case. The fact that plaintiff could perform work while incarcerated demonstrates that his medical condition does not substantially limit his ability to work. Cf. *Gelabert-Ladenheim v. American Airlines, Inc.*, 252 F.3d 54, 59-63 (1st Cir. 2001) (relying in part on plaintiff's pre- and post-impairment work history, court concludes that plaintiff was not "substantially limited" in her ability to work); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir. 1995) (welder was not substantially limited in her ability to work where she could work as welder in fab shop); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722-24 (2d Cir. 1994) (construing Rehabilitation Act's similar definition of disability and concluding that asthmatic was not substantially limited in working because she could work in other areas of hospital without aggravating her asthma); *Smaw v. Va. Dep't of State Police*, 862 F. Supp. 1469, 1475 (E.D. Va. 1994) (plaintiff's "present position as a dispatcher would seem to negate any argument that she is disqualified from her profession by her weight"). Significantly, plaintiff himself describes his condition as an inconvenience.

¶ 10. Plaintiff argues that notwithstanding his ability to work at a number of jobs at the prison, his need to be in reasonable proximity of medical care presents a geographical and temporal limitation on his ability to work. He points out that regulations issued under Title I of the ADA direct courts to consider the jobs available and foreclosed to the individual in the geographical area to which the individual has access. See 29 C.F.R. § 1630.2(j)(3)(ii)(A) (2003). Plaintiff analogizes his situation to one described in guidelines interpreting those regulations:

> [S]uppose an individual has an allergy to a substance found in most high rise office buildings ... [making] breathing extremely difficult. Since this individual would be substantially limited in the ability to perform the broad range of jobs in various classes that are conducted in high rise office buildings within the geographical area to which he or she has reasonable access, he or she would be substantially limited in working.

29 C.F.R. Pt. 1630.2(j), App. (2003). Plaintiff claims that because his condition precludes him from working any job at the work camp, his impairment is substantially limiting.

¶ 11. Plaintiff's analogy is inapposite. It is not, in the instant case, a matter of an individual being precluded from a wide variety of jobs because the medical condition is aggravated by a factor common to the workplaces where the jobs are (i.e., an allergy aggravated by substances in high-rise office buildings). Rather, the individual is precluded from a wide variety of jobs because he is in prison having been convicted of a crime. Thus, plaintiff's situation is more analogous to a worker whose allergies preclude her from doing office work in a particular office building (the work camp) but can perform similar work in other buildings without problems (NSCF). See *Heilweil,* 32 F.3d at 723-24. As such, plaintiff's choice of work sites may be limited, but the limitation is not a factor of his medical condition, it is a factor of his incarceration.

¶ 12. It will always be the case that an inmate's "restrictive environment" creates a substantial limitation in a broad range of jobs in various classes. A prison guard with the same medical condition as plaintiff could not successfully argue that she was disabled within the meaning of the ADA by insisting that only correctional facilities be used as the "geographic area" to determine whether her angina substantially limited her ability to work. Yet, plaintiff's arguments seek exactly that result. We do not believe this is what Congress intended when it passed legislation to enable the disabled to "pursue those opportunities for which our society is justifiably famous." 42 U.S.C. § 12101(a)(9) (1995). Plaintiff is not disabled within the meaning of subsection (2)(A) of § 12102.

¶ 13. Plaintiff claims that even if his impairment does not substantially limit his ability to work, the DOC regards him as disabled, and thus he falls within the ADA's protection. Under § 12102(2)(C), a person is disabled if he is *regarded* as having "a physical or mental impairment that substantially limits one or more of the major life activities." *Id.* § 12102(2)(A), (C). To benefit from this definition of "disabled," plaintiff must show that the DOC believes either that plaintiff "has a substantially limiting impairment that [he] does not have or that [he] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 489 (1999). Key to each instance is that the covered entity misperceives the individual's actual circumstances. *Id.* Moreover, under Title I of the ADA, employers are free to set certain physical and medical qualifications for particular jobs and not run afoul of the Act. *Id.* at 490. In other words, employers may "decide that some limiting, but not *substantially* limiting, impairments

make individuals less than ideally suited for a job." *Id.* at 491 (emphasis in original).

¶ 14. In this case, the DOC decided not to place plaintiff at the work camp to perform the same job he was doing at the prison because it has no medical coverage for plaintiff's condition. The DOC holds no misperceptions about the nature of his heart. condition, however, nor does it regard plaintiff as substantially limited in his ability to work. As the trial court found, the DOC permitted plaintiff to work full time at the prison laundry in addition to other jobs. Because the DOC does not regard plaintiff's heart condition as substantially limiting his ability to work, plaintiff is not disabled within the meaning of § 12102(2)(C).

¶ 15. In light of our holding that plaintiff is not disabled for purposes of the ADA, we render no opinion on the trial court's decision that plaintiff's accommodation request was unreasonable.

*Affirmed.*

¶ 16. **Johnson, J.,** dissenting. The logic underlying the Court's conclusion that the Department of Corrections did not discriminate against plaintiff on the basis of a physical disability, although it indisputably denied him access to a community-based prison work camp solely because of his heart condition, recalls the old children's adage: "I saw a man upon the stairs. I looked again, he was not there. I wish he'd go away." There is a strangely similar disconnect in the Court's reasoning, and while the fault may lie to some extent in the inherent difficulty of enforcing a civil rights statute inside a prison setting, we have a responsibility nevertheless to protect even our prison population from invidious discrimination on the basis of physical or mental disability. Because I do not believe that the Court has adequately addressed this responsibility, I must respectfully dissent.

¶ 17. The facts here were generally undisputed. The State conceded that plaintiff, an inmate at the Northern State Correctional Facility in Newport, has a "physical impairment" under the Americans with Disabilities Act. 42 U.S.C. § 12102. His condition, known as Prinz-Metil angina, results in occasional spasms of the coronary artery and requires that plaintiff initially take several nitroglycerin tablets and then, if the pain persists, have an EKG to determine if further treatment is necessary. Failure to diagnose and treat within two hours of the spasm could result in a heart attack. Accordingly, as the trial court here found, "proximity to, and availability of 24-hour EKG capability is critical to successful monitoring, and management of [plaintiff's condition]."

Northern State is one of the few correctional facilities in Vermont that has twenty-four hour medical coverage.

¶ 18. Plaintiff sought to transfer to the Caledonia prison work camp, located adjacent to the Northeast Regional Correctional Facility in St. Johnsbury, to take advantage of the opportunity offered there to earn double "good time" credit. Inmates at the camp generally work during the day on projects in local communities, although jobs in the camp laundry and elsewhere on site are also available. The camp is staffed by an on-duty nurse from 6:00 a.m. to 2:30 p.m. Additional medical care is available sixteen hours per-day at the nearby Northeast Regional Facility, but neither has twenty-four hour care. The Department determined that plaintiff was not "medically qualified" to participate in the work camp because of the lack of twenty-four hour medical coverage to monitor and manage his heart condition. The trial court affirmed the Department's decision, concluding, among other things, that plaintiff is not "disabled" under the ADA because he is barred from working in only one location, the work camp, and therefore is not substantially limited in his ability to work. See *id.* § 12102(2)(A) (defining "disability" as a physical or mental impairment that "substantially limits" one or more major life activities, which includes "working").

¶ 19. The Court here, like the trial court below, reaches the same paradoxical conclusion that plaintiff is not disabled within the meaning of the ADA because — with access to adequate medical care — his condition does not generally limit his ability to work, although it is undisputed that plaintiff was denied access to the prison camp *solely* because the Department determined that his medical condition precludes him from working there. To be fair, responsibility for this anomaly does not rest entirely with the Court, but may be traced to the federal rule defining a "substantial limitation" on work as an inability to perform "either a class of jobs or a broad range of jobs in various classes," and precluding from the definition the inability to perform "a single, particular job." 29 C.F.R. § 1630.2(j)(3)(i); see *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 491 (1999) ("substantially" limited in the ability to work requires that plaintiffs allege they are unable to work in a "broad class of jobs"). Yet the federal regulations also recognize that a substantial limitation may arise from a significant restriction on the "*condition,* manner or duration under which an individual" can perform his or her work, 29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added), as well as from the "*geographical* area to which the individual has reasonable access." *Id.* § 1630.2(j)(3)(ii)(A) (emphasis added).

¶ 20. Thus, the evidence here plainly supports the conclusion that plaintiff has a medical impairment that restricts his employment to work sites that, as his physician testified, afford relatively "quick and easy" access to sophisticated medical care. It is inconceivable, for example, that plaintiff's condition would allow him to work at any job located more than one hour's drive from a medical facility equipped with EKG-monitoring equipment, or in a job where he was alone. It is reasonable to conclude, therefore, that plaintiff's heart ailment imposes a significant "condition" on the circumstances in which he can work, and significantly limits the "geographic area" of employment to which he reasonably has access.[2] See, e.g., *Guice-Mills v. Derwinski*, 967 F.2d 794, 797 (2d Cir. 1992) (plaintiff with illness that generally restricted ability to arrive at work during early morning hours had physical impairment that substantially limited ability to work under analogous provisions of Rehabilitation Act of 1973); *Potvin v. Champlain Cable Corp.*, 165 Vt. 504, 510, 687 A.2d 95, 99 (1996) (plaintiff with gastrointestinal ailment that made it impossible to work evening hours was substantially limited in ability to work under ADA and Rehabilitation Act); 29 C.F.R. Pt. 1630 App. § 1630.2 (individual with allergy to substance found in most high rise buildings is substantially limited in ability to perform range of jobs). It follows that plaintiff's heart condition significantly limits his ability to work, and therefore constitutes a disability under the ADA.

¶ 21. The Court concludes, nevertheless, that plaintiff is not substantially limited in his ability to work, and therefore is not disabled under the Act, because the *only* prison work site from which plaintiff is precluded as a result of his medical condition is the community work camp. As the Court explains, "plaintiff's choice of work sites may be limited, but the limitation is not a factor of his medical condition, it is a factor of his *incarceration." Ante*, at ¶ 11 (emphasis added).

¶ 22. With all due respect, I believe the majority's analysis is deficient. The United States Supreme Court has determined that Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq., "unmistakably includes State prisons and prisoners within its coverage." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998). As many commentators have observed, however, the Court's holding in *Yeskey* raised more

---

[2] The fact that plaintiff here, like most individuals with disabilities, insists that with reasonable accommodations his condition does not impose any significant restriction on his ability to work does not preclude a finding that he is disabled, or "regarded as" disabled, in the legal sense under the ADA. 42 U.S.C. § 12102(2)(C) (1995). Otherwise, no one with a disability could ever prove that he or she was "qualified" to perform the job. *Id.* § 12131(2); 28 C.F.R. § 35.140(a) (2003).

questions than it answered for purposes of actually applying the anti-discrimination provisions of the ADA in the unique context of a state prison. Yet the Court fails even to mention *Yeskey*, much less come to grips with its implications for the case at bar. See, e.g., S. Carnahan, *The Americans with Disabilities Act in State Correctional Institutions*, 27 Cap. U. L. Rev. 291, 314-15 (1999) (Court of Appeals decision in *Yeskey* did not resolve, and Supreme Court did not address, difficult question of whether, and to what extent, traditional principles of deference to decisions of prison administrators in constitutional context apply to statutory claims under ADA); Comment, *Broad Statutory Language Is Not Ambiguous: The Americans Disability Act Applies in State Prisons*, 15 J. Contemp. Health L. & Pol'y 275, 304 (1998) (*Yeskey* raises fundamental issue as to "how the ADA will be applied in the prison setting"); Note, *Winning the Battle, Losing the War?: Judicial Scrutiny of Prisoners' Statutory Claims Under the Americans with Disabilities Act*, 98 Mich. L. Rev. 482, 483-84 (1999) (*Yeskey* promises to have "far-reaching . . . consequences," having left unresolved fundamental issue concerning "the level of judicial scrutiny that prisoners' ADA claims should receive"); see also *Turner v. Safley*, 482 U.S. 78, 89-91 (1987) (courts must generally consider four factors in balancing prisoner's constitutional claims against reasonableness of prison regulation, including nexus between regulation and claimed governmental interest, existence of alternative means of exercising right, impact of accommodation of right on prison population and prison resources, and availability of ready alternatives to regulation).

¶ 23. I submit that the only way to give real meaning to the ADA's overarching "national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1) — in an institutionalized prison setting — is to require equal access to the programs and services to which the inmates *realistically* have access. Chief Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit eloquently articulated this position in a case that anticipated the Court's holding in *Yeskey*. Disabled prisoners, he wrote:

> have the same interest in access to the programs, services, and activities available to the other inmates of their prison as disabled people on the outside have to the counterpart programs, services, and activities available to free people. They have no right to more services than the able-bodied inmates, but they

have a right, if the Act is given its natural meaning, not to be treated even worse than those more fortunate inmates.

*Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 486 (7th Cir. 1997).[3]

¶ 24. What this means, in my view, is that just as the prison context must be considered in evaluating the burden on the Department of a particular proposed accommodation, so too must the unique circumstances of prison life be recognized in evaluating the legitimacy of an inmate's claimed disability. The reality of prison life cuts both ways. Courts must recognize the Department's special security needs, but must equally acknowledge an inmate's truncated opportunities for work, service, education, and other benefits and programs. See Note, *supra*, 98 Mich. L. Rev. at 505 (courts must "incorporate the unique circumstances of prison life into their determinations under the [ADA]"). The Court's facile rejection of plaintiff's claim simply because his medical condition restricts him from only one work site — the only community work-camp available — ignores this reality. The Court's further suggestion that plaintiff's argument would lead to the absurd result of measuring a prison guard's "geographic" access to employment by the opportunities available in prisons is equally misguided, as the guard obviously has a broad range of employment choices outside the prison context. The inmate has no choice.

¶ 25. Measuring plaintiff's access to work programs against that of the average inmate — rather than the average person in the general population — leads to the obvious conclusion that plaintiff's heart ailment substantially limits his ability to work, as it bars him from participation in the only community-based work program of its kind for inmates in plaintiff's position. The common-sense conclusion that plaintiff is disabled within the meaning of the ADA is, therefore, inescapable.

¶ 26. A similar focus on institutional context should also inform the Court's reasonable-accommodation analysis. See 28 C.F.R. § 35.130(b)(7) (public entity must provide disabled individual with reasonable accommodation to assist the individual in becoming qualified for participation in program, but need not do so if it would cause undue hardship). To protect

---

[3] In *Erickson v. Bd. of Governors*, 207 F.3d 945, 948 (7th Cir. 2000), a divided panel of the Seventh Circuit reversed *Crawford*'s holding that Congress had validly abrogated Eleventh Amendment state immunity under Title II of the ADA, but left undisturbed *Crawford*'s construction of the ADA as applying to state prisons, thus allowing actions by prisoners in state courts or by the United States. 207 F.3d at 952. Others have reached a different conclusion concerning state immunity from suit under the ADA. See, e.g., *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1184 (9th Cir. 2003) (Congress validly abrogated Eleventh Amendment state immunity under Title II of ADA).

prisoners from discrimination based on physical or mental disability, and simultaneously acknowledge the needs of prison administration, a key consideration must be whether the inmate's claim implicates prison security or institutional order. See, e.g., *Pitts v. Thornburgh*, 866 F.2d 1450, 1453-54 (D.C. Cir. 1989) (prisoner claims that implicate "general budgetary and policy choices" rather than security concerns do not require same level of administrative deference). There is no claim or evidence here that plaintiff's request for access to the work camp poses any security risk.

¶ 27. Another consideration is, of course, the cost of accommodating plaintiff's participation in the work program. As noted, any accommodation must be "reasonable," and not impose an undue burden on prison administration. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.130(b)(7). Although the Department adduced evidence of the potentially crippling cost of implementing twenty-four hour medical care at the work camp, there is no evidence that it explored any less costly alternatives. See *Crawford*, 115 F.3d at 483 (state has burden to show that there was no reasonable accommodation that would have enabled plaintiff to participate in program or that making necessary accommodation would place undue financial or administrative burden on prison system); 28 C.F.R. § 35.130(b)(7) (public entity must make reasonable modifications necessary to avoid discrimination, unless "public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity"). Although the trial court did not address the issue, the record suggests that some economically feasible solutions might have been available, such as simply equipping plaintiff with a cell phone to call for an ambulance in the event of a medical emergency either on the job or after working hours, to supplement the sixteen hour medical care available at the nearby St. Johnsbury prison. Flexible accommodations such as these will certainly become increasingly necessary if the ADA is to be applied to state prison facilities without undue disruption to prison administration or onerous costs to the state.

¶ 28. The ADA contains no specific provisions designed for application to state prisons; indeed, it makes no reference whatsoever to such facilities. Yet the United States Supreme Court saw fit to determine that the ADA's prohibition against discrimination on the basis of physical or mental disability in the services, programs or activities of a public entity "unambiguously extends to state prison inmates." *Yeskey*, 524 U.S. at 213. To give meaning to that holding, prison administrators — and courts — must adapt rules and regulations designed for the general populace to the special needs of administrators and inmates of a uniquely closed

institution. Otherwise, as today's holding suggests, the high court's decision may be rendered a nullity, and prisoners with genuine disabilities will be denied the protection of the law.

¶ 29. I am authorized to state that Justice Dooley joins this dissent.