2006 VT 134

## Department of Corrections v. Human Rights Commission

[917 A.2d 451]

No. 04-503

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed December 29, 2006

*William H. Sorrell*, Attorney General, Montpelier, and *Marie J. Salem* and *Kate Duffy*, Assistant Attorneys General, Waterbury, for Petitioner-Appellant.

*Robert Appel*, Executive Director, Montpelier, for Respondent-Appellee.

*Barbara Prine*, Vermont Legal Aid, Burlington, for Intervenor-Appellee.

¶ 1. **Johnson, J.** The issue in this appeal is whether the Vermont Fair Housing and Public Accommodations Act, 9 V.S.A. §§ 4500-4507,

applies to state correctional facilities, thereby giving the Human Rights Commission jurisdiction to investigate complaints filed by state prisoners alleging violations of the Act. Based upon its determination that the Act covers state prisons, the superior court denied the Department of Corrections' motion to quash a subpoena served by the Commission in conjunction with a prisoner's discrimination claim. The Department contends that the court erred insofar as prisons do not offer services or benefits to the "general public" and thus are not "places of public accommodation" subject to the Commission's investigatory powers. We conclude that the Legislature intended to make all governmental entities, including state prisons, subject to the Act. Accordingly, we affirm the superior court's decision.

¶ 2. On appeal, the Department relies primarily on a single phrase in one statutory definition to support its argument that state prisons are not covered by the public accommodations statute. Nothing in the language or history of the statute, however, indicates that the Legislature intended the law to cover some governmental entities, but not others, depending on whether, or how directly, they offer services or benefits to the general public. The phrase "general public" within the statutory definition of a "place of public accommodation" is a holdover from the original 1957 statute, which, like similar laws in other jurisdictions, was aimed at assuring that private establishments catering to members of the general public did not discriminate on the basis of race or other specified criteria. Hence, a "place of public accommodation" was defined as an establishment that provided benefits or services to the general public. The critical inquiry, then, in determining which private entities were covered by the law was whether a particular establishment served the general public. That question makes little sense, however, when applied to public or governmental entities, which are created for the very purpose of serving the general public.

¶ 3. The most reasonable interpretation of the statute, particularly considering that it must be liberally construed to effectuate its remedial purpose, is that the Legislature intended to make all governmental entities, in addition to all private entities offering services or benefits to the general public, subject to the Act's anti-discrimination provisions. There is support for this interpretation not only in the statutory language, but also in the history of the statutory amendments and the legislative policy underlying the Act. In particular, the legislative history of the 1992 amendment unequivocally confirms that the Act was intended to apply to all governmental entities and to provide a local enforcement mechanism for claims actionable under the Americans

with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12300, which applies to all public entities, including state prisons.

¶ 4. The Human Rights Commission has jurisdiction to investigate and enforce complaints of unlawful discrimination in public accommodations. 9 V.S.A. § 4552(b). Pertinent to this case, it is generally unlawful for any place of public accommodation to discriminate against an individual with a disability. *Id.* § 4502(c). The Commission may accept complaints that state a prima facie case of discrimination, and must dismiss those that do not. *Id.* § 4554(a)-(b). In conducting an investigation, the Commission can issue subpoenas with respect to complaints filed under § 4554 where there is reasonable cause to believe that the materials or testimony requested are material to the complaint. *Id.* § 4553(a)(5).

¶ 5. In November 2003, the Commission served a subpoena on the Department in connection with a discrimination charge filed on behalf of a state prisoner. The prisoner complained that the Department's correctional facility discriminated against him on the basis of his disability. The Department moved the Commission to quash the subpoena under § 4553(a)(5), asserting that the complaint failed to state a prima facie case of discrimination because a correctional facility was not a "place of public accommodation" under the Act. The Commission denied the Department's request in December 2003.

¶ 6. The Department then moved to quash the subpoena in superior court. In September 2004, following a hearing, the court denied the Department's motion and granted the Commission's motion to enforce the subpoena. Relying on *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998), the court concluded that Vermont's correctional facilities plainly offered "services, facilities, goods, privileges, advantages, benefits or accommodations" to prisoners and thus was a "place of public accommodation." See 9 V.S.A. § 4501(1). According to the court, irrespective of whether the physical structures of government buildings, including prisons, are open to the public, state prisons are essentially public places open to any member of the general public unfortunate enough to meet the criteria for obtaining their services. The court granted the Department's request for a stay, and this appeal followed.

¶ 7. On appeal, the Department argues that the Human Rights Commission did not have jurisdiction to issue its subpoena in this case because correctional facilities do not serve or benefit the general public and thus are not "places of public accommodation" under the Act. This

is a case of statutory interpretation in which our review of the trial court's decision is nondeferential and plenary. *Human Rights Comm'n v. Benevolent & Protective Order of Elks*, 2003 VT 104, ¶ 13, 176 Vt. 125, 839 A.2d 576. "Our paramount goal, when interpreting a statute, is to effectuate the intent of the Legislature." *Id.* As we stated in *Order of Elks*, a recent case interpreting the Act, we effectuate legislative intent by looking "to the statute's language and any legislative history, as well as the legislative policy the statute was designed to implement." *Id.* We also stressed in *Order of Elks* that, as a remedial statute, the Act "must be liberally construed in order to 'suppress the evil and advance the remedy' intended by the Legislature." *Id.* (quoting 3 N. Singer, Statutes and Statutory Construction § 60:1, at 183 (6th ed. 2001)).

¶ 8. To interpret the Legislature's intent, we begin by examining the statutory language. *Russell v. Armitage*, 166 Vt. 392, 403, 697 A.2d 630, 637 (1997). Our public accommodations statute forbids owners or operators of places of public accommodation from discriminating on the basis of specified criteria. 9 V.S.A. § 4502. "Public accommodation" is defined as "an individual, organization, governmental or other entity that owns, leases, leases to or operates a place of public accommodation." *Id.* § 4501(8). "Place of public accommodation," in turn, is defined as "any school, restaurant, store, establishment or other facility at which services, facilities, goods, privileges, advantages, benefits or accommodations are offered to the general public." *Id.* § 4501(1). The interpretive problem arises because the definition of "place of public accommodation" retains the term "general public," which historically was used to determine which *private* entities were subject to the law, while the relatively recent definition of "public accommodation" does not necessarily restrict governmental entities to the criteria set forth in the definition of "place of public accommodation."

¶ 9. The statute also has a legislative intent section that was added in 1992 to ensure that the Public Accommodations Act would be applied consistently with the then recently enacted federal Americans with Disabilities Act, 42 U.S.C. §§ 12101-12300. That section states:

> (a) The provisions of this chapter establishing legal standards, duties and requirements with respect to persons with disabilities in places of public accommodation as defined herein, except those provisions relating to remedies, are intended to implement and to be construed so as to be consistent with the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. and rules adopted thereunder, and are not in-

tended to impose additional or higher standards, duties or requirements than that act.

(b) Subsections 4502(b) and (c) of Title 9 shall not be construed to create or impose on governmental entities additional or higher standards, duties or requirements than that imposed by Title II of the Americans with Disabilities Act.

9 V.S.A. § 4500.

¶ 10. It is undisputed that prisoners may pursue discrimination claims under Title II of the ADA, 42 U.S.C. §§ 12131-12134. See, e.g., *Charbonneau v. Gorczyk*, 2003 VT 105, ¶ 8, 176 Vt. 140, 838 A.2d 117 (reviewing state prisoner's discrimination claim against commissioner of Department of Corrections, and noting that the ADA "prohibits state agencies like the DOC from excluding an individual from a DOC program because of the individual's disability"). Indeed, in a unanimous opinion, the United States Supreme Court has held that Title II of the ADA "unmistakably includes State prisons and prisoners within its coverage." *Yeskey*, 524 U.S. at 209. Hence, the real issue in this case is whether prisoners can use the local enforcement provisions of the Public Accommodations Act to raise claims actionable under the ADA. This point is significant because, as discussed below, the legislative history reveals that the 1992 amendment was intended not only to make it explicit that government entities are covered by the Public Accommodations Act, but also to allow persons with claims under the ADA to bring those claims within the local enforcement scheme provided in the Act.

¶ 11. The ADA has two distinct subchapters that deal with, on the one hand, public entities, and on the other, private entities serving the public. Subchapter II, entitled "Public Services," prohibits a "public entity," including any agency or department of a local or state government, 42 U.S.C. § 12131, from denying benefits or services to any qualified individual. *Id.* § 12132. Subchapter III, entitled "Public Accommodations and Services Operated by Private Entities," prohibits private entities that are considered places of public accommodation from discriminating on the basis of disability with respect to the services or benefits they offer. *Id.* §§ 12181(7), 12182. Thus, the ADA covers all public (i.e. governmental) entities and all private entities serving the public.

¶ 12. Although the 1992 amendment did not adopt the bifurcated format contained in the ADA, the legislative history demonstrates that

the amendment was intended to: (1) make it explicit that the public accommodations law applies to governmental entities; (2) integrate the duties and requirements of the ADA into the public accommodations law so that covered entities would not be subjected to varying standards under federal and state law; and (3) create a local enforcement mechanism under the public accommodations law for complaints otherwise actionable under the ADA. With respect to the first objective, the Legislature added within the definition section of the statute the term "public accommodation," which it defined as "an individual, organization, *governmental* or other entity that owns, leases, leases to or operates a place of public accommodation." 1991, No. 243 (Adj. Sess.), § 1 (emphasis added). The Legislature also expanded the definition of "place of public accommodation," but retained the term "general public." *Id.* (amending definition of "place of public accommodation" from "any school, restaurant, store or other establishment which caters or offers its services or facilities or goods to the general public" to "any school, restaurant, store, establishment or other facility at which services, facilities, goods, privileges, advantages, benefits, or accommodations are offered to the general public"). With respect to the second objective, the Legislature added the legislative intent provision set forth above. *Id.* § 5.

¶ 13. Thus, the critical statutory language concerning the present dispute — including the definition of "public accommodation" that referred for the first time to governmental entities — was inserted as part of the 1992 amendment that came about, in large part, as a response to the enactment of the ADA. The chief proponent of the bill (Senate Bill 403) was the Vermont Coalition for Disability Rights (VCDR), with the full support of, and input from, the Human Rights Commission. At hearings before both the Senate Judiciary and General Housing and Military Affairs Committees, a representative of the VCDR and the executive director of the Commission provided extensive testimony on the meaning and purpose of the amendments. Much of the relevant testimony took place at a March 5, 1992 hearing before the Senate General Housing and Military Affairs Committee.

¶ 14. Referring to the newly inserted definition of public accommodation, which expressly included governmental entities, the VCDR representative stated that the words governmental entity were included in the definition at the suggestion of the Commission to make it explicit that the public accommodations law applied to government agencies. She told the committee that VCDR was not "asking the public entities to do anything that they are not already required to do

under the ADA." She further stated that one of the main purposes of the bill was to put the ADA into Vermont law so that the Commission would be "available and able to investigate complaints of discrimination by public accommodations." In that way, "we would have a local, fairly quick way of resolving complaints," which would benefit both sides.

¶ 15. The executive director of the Commission reiterated these points in her testimony. In addition to stressing the need for local enforcement so that parties would not be relegated to a vague federal enforcement scheme, she stated as follows:

> The other thing that this bill does is it makes it clear that governmental entities are considered a place of public accommodation. That also has been unclear in the current law. We have been interpreting the current law to include government entities because the definition of a place of public accommodation in current law is very broad. . . . Many other states specifically include governmental entities as a place of public accommodation. And we think that our general definition would cover it, but this bill would make that clearer as well.

When one of the committee members asked her if the new definition of public accommodation was in the ADA, the executive director responded by explaining that the ADA had separate subchapters dealing with public entities (Subchapter II) and with private places of public accommodation (Subchapter III), but that the term "public accommodation" was used only in Subchapter III. She stated that rather than follow this more complicated format, they had "telescoped" the provisions into one bill.

¶ 16. Several other witnesses from all sides expressed support for the amendment and recognized its main purposes of clarifying the standards and obligations of the law and providing a local enforcement mechanism for the ADA. A representative of the Department of Aging and Disabilities acknowledged that the bill would ensure enforcement of public access at the local level and stated that "[a]dding state government to the provisions of the public accommodations bill will not be an issue, in my opinion, that will present an undue burden [on] . . . state government." He opined that the amendment would benefit all concerned, including businesses and state government, by allowing the parties to work out complaints promptly and locally through the Commission. Witnesses representing business interests were also

supportive of the bill, their main concern being that they would not be subject to differing state and federal standards.

¶ 17. A representative of the Vermont League of Cities and Towns (VLCT) also expressed support for the bill, but wanted the public accommodations law to expressly state that government entities would be subject to standards and obligations set forth in Subchapter II of the ADA, as opposed to Subchapter III dealing with private entities. When one committee member asked her what was confusing about the bill as written, she stated that "you are throwing everybody into the same pot." Her concerns resulted in adding an apparently redundant second subsection to the legislative intent provision included in the bill. The first subsection of that provision, upon which the dissent relies, states that the provisions establishing standards, duties, and requirements with respect to persons with disabilities "in places of public accommodation as defined herein" are intended to implement and be construed as consistent with the ADA. 9 V.S.A. § 4500(a). According to the VLCT representative, however, the quoted phrase was put there to make it clear that the legislative intent section applied only to the public accommodations provisions and not the fair housing provisions contained in the same chapter. Thus, the phrase was not intended to restrict the scope of the public accommodations law, as the dissent suggests.

¶ 18. The testimony of these witnesses, and their discussions with committee members, demonstrate that the 1992 amendment to the Public Accommodations Act was intended to make it explicit that governmental entities are places of public accommodation, consistent with the ADA. Rather than adopt the bifurcated structure of the ADA in which all public entities are subject to the anti-discrimination law under Subchapter II, and *other* places of public accommodations (i.e. private enterprises that cater to the public) are subject to the law under Subchapter III, the Legislature simply incorporated governmental entities into a newly added definition of "public accommodation" with the expectation that the law would apply to them in general.

¶ 19. "We have frequently relied upon legislative history where the meaning of the statute cannot be determined from the words alone." *In re Dep't of Bldgs. & Gen. Servs.*, 2003 VT 92, ¶ 14, 176 Vt. 41, 838 A.2d 78. Although the remarks of a single witness at a committee hearing are generally given little weight in determining legislative intent, *id.*, we have relied upon committee testimony and legislators' discussions when they convincingly reveal the intent underlying a statute. See, e.g., *In re Hinsdale Farm*, 2004 VT 72, ¶ 17, 177 Vt. 115, 858 A.2d 249

(citing committee testimony that convincingly illustrated legislative intent). Here, it is appropriate to rely on the legislative history to help us understand the legislative intent underlying the Public Accommodations Act, as it has been amended over the years.

¶ 20. Construing the Public Accommodations Act to apply to all governmental entities also makes sense in light of the underlying policy and evolution of the law. As noted, Vermont's statute dates back to 1957. *Order of Elks*, 2003 VT 104, ¶ 15. As with other state statutes, the primary target of Vermont's statute was private businesses that catered to the general public.[1] See Lerman & Sanderson, *supra*, note 1, at 218 ("Proscription of discrimination in public accommodations is premised on the notion that many privately-owned establishments are to some extent public."). The statute, which consisted of three sentences, prohibited "[a]n owner or operator of a place of public accommodation" from discriminating based on race, creed, color or national origin by denying any person "any of the accommodations, advantages, facilities and privileges of such place of public accommodation." 1957, No. 109, § 1. A place of public accommodation was defined as "any establishment which caters or offers its services or facilities or goods to the general public." *Id.*

¶ 21. In the ensuing decades, the Legislature enacted several amendments that, as with public accommodation statutes in other states, "broadened [the statute's] scope with regard to the groups

---

[1] Our Public Accommodations Act is a descendent of laws enacted by other jurisdictions beginning in the second half of the nineteenth century to bolster the common law precluding innkeepers and common carriers from refusing to serve any member of the general public. See *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 571 (1995) (describing the common law under which innkeepers and others who served the public were prohibited from refusing, without good reason, to serve customers). See generally L. Lerman & A. Sanderson, *Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws*, 7 N.Y.U. Rev. L. & Soc. Change 215, 218, 238-40, 242 (1978) (discussing the history of state public accommodations statutes and noting that early statutes were considered restatements of the obligation of innkeepers and common carriers to admit all travelers); J. Singer, *No Right to Exclude: Public Accommodations and Private Property*, 90 Nw. U. L. Rev. 1283, 1303-13, 1374 (1996) (discussing the scope of early public accommodations common law and listing state statutory enactments). Innkeepers and common carriers were considered to be "'a sort of public servants,'" *Hurley*, 515 U.S. at 571 (quoting *Rex v. Ivens*, 7 Car. & P. 213, 219, 173 Eng. Rep. 94, 96 (N.P. 1835)), because they engage in "public employment" or "a trade which is for the public good." See Singer, *supra*, at 1305-06, 1312-13, 1327-30.

protected from discrimination under the statute and the establishments or facilities covered by definition." *Order of Elks*, 2003 VT 104, ¶ 15; see *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (noting that many states have "progressively broadened the scope of [their] public accommodations law ... both with respect to the number and type of covered facilities and with respect to the groups against whom discrimination is forbidden"). As discussed above, the statute was amended in 1992, in part, to clarify that government entities are covered by the statute. Retention of the term "general public," which had been part of the statutory language since the law's inception in 1957, does not suggest that the Legislature intended to distinguish between government entities depending on the degree of contact with the general public.

¶ 22. Nevertheless, like the Department, the dissent relies almost exclusively on dictionary definitions of the words "general" and "public" in concluding that prisons do not offer benefits or services to the general public and thus are not subject to the anti-discrimination provisions of our public accommodations law.[2] For the reasons set forth

---

[2] Even assuming that the Legislature did intend somehow to distinguish between governmental entities that do and do not serve the general public, one could make a strong argument that prisons should be considered an institution that serves the general public. As the United States Supreme Court acknowledged in a unanimous opinion construing the ADA, "[s]tate prisons fall squarely within the statutory definition of 'public entity,'" and they plainly provide benefits and services to prisoners. *Yeskey*, 524 U.S. at 210. Prisoners are members of the general public, and any member of the general public who commits a crime may be incarcerated and subjected to the benefits and services of the prison system. State prisons, like many hospitals or even schools, are places where people do not necessarily want to go, but any member of the public meeting certain criteria may be "invited" — and is entitled — to participate in their programs and receive their benefits. See *Chisolm v. Manimon*, 97 F. Supp. 2d 615, 621-22 (D.N.J. 2000) (finding jails to be analogous to hospitals with respect to the state public accommodations law and predicting that the New Jersey Supreme Court would find jails and prisons to be places of public accommodation); cf. *Neal v. Mich. Dep't of Corr.*, 592 N.W.2d 370, 373-74 (Mich. Ct. App. 1998) (holding that state correctional facilities are places of "public service" subject to the state civil rights act). But see *Skaff v. W. Va. Human Rights Comm'n*, 444 S.E.2d 39, 41-42 (W. Va. 1994) (holding that penal institutions are not places of public accommodation under state law because incarcerated individuals are not members of the general public).

Moreover, apart from the direct benefits and services to prisoners, state prisons benefit and serve the general public by protecting members of the general public from dangerous individuals. State prisons do this both by physically incarcerating and by rehabilitating those individuals. As stated in 28 V.S.A. § 1(a), the purpose of the Department of Corrections is to administer a program "designed to protect persons

above, we decline to construe the statute so narrowly. While we are generally restricted to the commonly understood meaning of "absolutely clear and unambiguous" statutory language, "if any question remains as to the intent underlying the statute, we also look at 'the legislative history and circumstances surrounding its enactment, and the legislative policy it was designed to implement.'" *In re McIntyre Fuels, Inc.*, 2003 VT 59, ¶ 7, 175 Vt. 613, 833 A.2d 829 (mem.) (quoting *Perry v. Med. Practice Bd.*, 169 Vt. 399, 406, 737 A.2d 900, 905 (1999)); see *Town of Killington v. State*, 172 Vt. 182, 189, 776 A.2d 395, 401 (2001) ("When the plain meaning of statutory language appears to undermine the purpose of the statute, we are not confined to a literal interpretation, but rather must look to the broad subject matter of the statute, its effects and consequences, and the purpose and spirit of the law to determine legislative intent.").

¶ 23. In light of the evolving scope of public accommodations law, the complicated history of our statute, and its arguably redundant provisions, the statutory language is not so clear that we can rely exclusively on the commonly understood meaning of two isolated words to determine the Legislature's intent. Cf. *Dep't of Bldgs. & Gen. Servs.*, 2003 VT 92, ¶ 13 (refusing to join the environmental court in concluding that the meaning of the statutory language was so plain that no aids of statutory construction should be employed); *Town of Killington*, 172 Vt. at 189-90, 776 A.2d at 401 (declining to accept the most commonly understood meaning of the general term "municipal budget" in the context of the specific statute, but instead liberally construing the statute to effectuate its remedial purpose and the intent of the Legislature). As noted above, the definition of a "place of public accommodation" is more useful for determining jurisdiction over private entities than it is for determining which governmental entities are public. Government is public.

---

... against offenders ... and to render treatment to offenders with the goal of achieving their successful return and participation as citizens of the state and community, to foster their human dignity and to preserve the human resources of the community." The Department is required to develop a program that, among other things, "will establish as its primary objective the disciplined preparation of offenders for their responsible roles in the open community." *Id.* § 1(b). To achieve these goals, the Department is directed to utilize, among other things, "the increased participation of the citizens of the state." *Id.* § 1(c). It would be difficult to conceive of purposes better illustrating that prisons are governmental entities serving and providing benefits to the general public.

¶ 24. The plain-meaning rule cannot be used to thwart judicial inquiry into the legislative intent behind statutory language that may initially appear plain upon a superficial examination. 2A N. Singer, Sutherland Statutory Construction § 48.01, at 302 (5th ed. 1992). Moreover, we would not be liberally construing the public accommodations law to implement its remedial purpose by holding that the retention of the phrase "general public" from the original statute demonstrates a legislative intent to distinguish between public entities that do and do not serve the general public. See Lerman & Sanderson, *supra*, note 1, at 242-43 (noting that statutes such as those in New Mexico, Oregon, and Vermont that use broad definitions of places of public accommodation "are assumed to cover places offering food and drink, lodgings and entertainment, as well as retail establishments and *state facilities*" (emphasis added)).

■ ¶ 25. In short, the general scheme of the public accommodations statute, viewed in light of its underlying purpose and history, demonstrates that the Legislature intended to make all governmental entities subject to the public accommodations law. The dissent asserts that "[t]here is nothing unclear or unreasonable about the Legislature distinguishing state prisons from other governmental entities." *Post*, ¶ 33. That is a debatable, but ultimately irrelevant, point, given that the Legislature has not exempted state prisons — or any other public entity for that matter — from a law that was intended to apply to governmental entities in general.

*Affirmed.*

¶ 26. **Burgess, J.,** dissenting. Constrained to read and apply what the Legislature enacted, rather than what the majority believes the Legislature meant to say, I respectfully dissent. We might frequently perceive an arguably better policy or reason to extend legislation beyond what is actually declared by the statute. It is not the function of this Court, however, to correct or change a statute that can otherwise effectively achieve a purpose plainly and unambiguously written by the Legislature.

¶ 27. We are asked to decide if a state correctional facility is a "place of public accommodation" under the Vermont Fair Housing and Public Accommodations Act, 9 V.S.A. §§ 4500-4507, and, consequently, whether the Human Rights Commission has jurisdiction to investigate

prisoner complaints of disability discrimination.[3] The statute defines a "place of public accommodation" to mean:

> any school, restaurant, store, establishment or other facility at which services, facilities, goods, privileges, advantages, benefits or accommodations are offered to the general public.

9 V.S.A. § 4501(1). Prisons do not offer "services, facilities ... or accommodations ... to the general public," and so are not places of public accommodation as defined by the statute.

¶ 28. In interpreting a statute, our goal is to implement legislative intent. *Herrick v. Town of Marlboro*, 173 Vt. 170, 173, 789 A.2d 915, 917 (2001). "The definitive source of legislative intent is the statutory language, by which we are bound unless it is uncertain or unclear." *In re Bennington Sch., Inc.*, 2004 VT 6, ¶ 12, 176 Vt. 584, 845 A.2d 332 (mem.). We presume that the Legislature intended the plain ordinary meaning of the language that it used, *Brennan v. Town of Colchester*, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999), and when the meaning of a statute is plain, it must be enforced according to its terms. *In re Middlebury Coll. Sales & Use Tax*, 137 Vt. 28, 31, 400 A.2d 965, 967 (1979). Remedial legislation, such as the 1992 amendment, should be liberally construed, *Human Rights Comm'n v. Benevolent & Protective Order of Elks*, 2003 VT 104, ¶ 13, 176 Vt. 125, 839 A.2d 576, but "liberal construction does not allow us to stretch the language beyond legislative intent." *Elkins v. Microsoft Corp.*, 174 Vt. 328, 331, 817 A.2d 9, 13 (2002).

¶ 29. Applying the language used, the Act is unambiguous. While prisons may provide services and accommodations to prisoners, prisoners are not "the general public" as that term is commonly understood. Black's Law Dictionary defines "general" as relating "to the whole kind, class, or order" and "open or available to all, as opposed to select." Black's Law Dictionary 614 (5th ed. 1979); see also Webster's Ninth New Collegiate Dictionary 510 (1985) (defining "general" as "involving, applicable to, or affecting the whole"). "Public" is defined as "[t]he whole body politic, or the aggregate of the citizens of a state,

---

[3] No one disputes that prisoners can pursue discrimination claims under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134 (2006). See, e.g., *Charbonneau v. Gorczyk*, 2003 VT 105, ¶ 8, 176 Vt. 140, 838 A.2d 117 (acknowledging that prisoner's disability discrimination complaint against Commissioner of Corrections was governed by Title II).

nation, or municipality." Black's Law Dictionary 1104 (5th ed. 1979); see also Webster's Ninth New Collegiate Dictionary 952 (1985) (defining "public" as "the people as a whole: populace"). The plain and ordinary meaning of the phrase "the general public," in both common and legal parlance, is the whole community at large.[4]

¶ 30. I am not persuaded, as is the majority, that the explicitly-defining phrase "to the general public" is a vestigial anachronism, a sort of statutory coccyx, that the Legislature intended to obviate through its 1992 expansion of "public accommodation" to include governmental facilities. We should presume, instead, that the Legislature intended to keep the preexisting definition in place as, indeed, it did here. See *Robes v. Town of Hartford,* 161 Vt. 187, 193, 636 A.2d 342, 347 (1993) (in considering statutory language, "we presume that the [L]egislature chose its words advisedly"). We should also presume that the Legislature appreciated the effect of its statutory definition on the newer legislation. *Scott v. St. Johnsbury Acad.,* 86 Vt. 172, 175, 84 A. 567, 568 (1912) ("It is to be presumed that in enacting [an amendment] the Legislature acted with full knowledge of the prior legislation on the subject . . . ."). While these canons of statutory construction need not be slavishly followed to an ineffective or unreasonable result, see *Audette v. Greer,* 134 Vt. 300, 302, 360 A.2d 66, 68 (1976) (observing that "it is essential that the [statutory] construction not be such that will render the act ineffective or lead to irrational consequences"), no such result obtains here, since all state governmental operations that do offer services to the general public are subject to the coverage plainly intended by the 1992 amendment.

¶ 31. The majority correctly points out that in the 1992 amendments the Legislature said that the Act's provisions concerning "legal standards, duties and requirements" were to be construed consistently with the ADA. Just as explicitly, however, the same declaration of "legislative intent" specifies that the Act is to apply to "places of public accommodation *as defined herein,*" 9 V.S.A. § 4500(a) (emphasis added), rather than as defined by the ADA. That the Legislature

---

[4] Individuals or a group of persons incarcerated in a state jail facility, although taken from the population at large due to their distinguishing behavioral characteristics, are not "the general public" in the ordinary sense of those words. This is not an academic result based on dictionary definitions, as suggested by the majority, but is reality. The Legislature elsewhere acknowledges this reality by noting that most institutionalized offenders "ultimately return to the community" and by directing the Department to prepare inmates "for their responsible roles in the open community." 28 V.S.A. § 1(b).

intended its definition of "public accommodation," and not that set forth in the ADA, to govern this particular element is clear from its revision of that very definition as part of the same 1992 amendment, which nevertheless maintained the statute's reach to facilities open to or serving "the general public." 1991, No. 243 (Adj. Sess.), § 1.[5]

¶ 32. The majority's reference to Title II and Title III of the Americans with Disabilities Act shows only that 9 V.S.A. § 4501(1) defines "public accommodation" more narrowly than "public entity" in the ADA. Had the Legislature intended the Act to apply to all "public entities," as under Title II of the ADA, it could have said so. The Legislature could have adopted the definition of "public accommodation" found in Title III of the ADA, 42 U.S.C. § 12181(7), but it did not do so.

¶ 33. There is nothing unclear or unreasonable about the Legislature distinguishing state prisons from other governmental entities. State prisons are, in fact, quite different from many other state governmental enterprises.[6] Unlike departments dealing with commercial regulation, motor vehicle registration, public assistance, revenue collection, licensing and the like, it is commonly understood that state correctional facilities, while public buildings, are neither open nor offer services, to the general public.[7] It is not irrational for the Legislature to obligate both public and private entities to respond to the Commission's subpoena power when open to, and serving, the general public. Nor is it

---

[5] If, as contended by the majority, this expression was inadvertent, the Legislature may always revisit and revise its legislation.

[6] Vermont would not have been unique in making this distinction. Construing a comparable statute, the West Virginia Supreme Court of Appeals similarly concluded that state prisons are not "places of public accommodations" for prisoners so that prisoner claims of discrimination did not fall within the jurisdiction of the state Human Rights Commission. *Skaff v. W. Va. Human Rights Comm'n*, 444 S.E.2d 39, 42 (W. Va. 1994). The court found it apparent that prisoners were not "members of the general public." *Id.* at 41. In *Blizzard v. Floyd*, 613 A.2d 619, 620-21 (Pa. Commw. Ct. 1992), the court considered the statutory definition of "public accommodation," defined in relevant part, as "any accommodation, resort or amusement which is open to, accepts or solicits the patronage of the general public," and concluded that state correctional facilities were not public accommodations because they did not "accept or solicit the patronage of the general public."

[7] There may, however, be parts of facilities, such as parking lots, lobbies and visiting rooms, that fall within the definition of "public accommodation" because they are actually open to, and do serve, the general public.

irrational to exclude prisons from Commission inquiry when prison operations, prison policies and prisoners' rights are already subject to frequent, if not constant, scrutiny by the Legislature, the Defender General's Office, see, e.g., *Charbonneau*, 2003 VT 105 (Prisoner's Rights Office represented inmate in ADA claim against the Department of Corrections commissioner), and the courts.

¶ 34. Equating the term "public accommodation" as defined in 9 V.S.A. § 4501(1) with "public entity" as defined in Title II of the ADA and applied in *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 209 (1998), is convenient for the majority's theory, but contrary to the expressed intent of the Legislature. "Great care should be exercised by the court not to expand proper construction of a statute into judicial legislation." *Harris v. Sherman*, 167 Vt. 613, 614, 708 A.2d 1348, 1350 (1998) (mem.) (quotations and brackets omitted). That the statute could have been edited differently to express a different intent does not render the statute unclear or ambiguous. "[L]egislative intent is to be ascertained from the act itself, which is presumed to be in accordance with the ordinary meaning of the statutory language," and "[w]here statutory language is clear and unambiguous in its meaning, as in the present case, we will look no further in an effort to determine a contrary legislative intent." *Cavanaugh v. Abbott Labs.*, 145 Vt. 516, 530, 496 A.2d 154, 163 (1985) (quotations omitted); see also *In re S. Burlington-Shelburne Highway Project*, 174 Vt. 604, 605, 817 A.2d 49, 51 (2002) (mem.) ("If the statute is unambiguous and the words have plain meaning, we accept and enforce that plain meaning as the intent of the Legislature, and our inquiry proceeds no further.").

¶ 35. Instead, the majority looks to testimony in committee hearings to promote its broader construction. This excursion into "legislative history," so called, is unnecessary and not particularly reliable. No ambiguity compels us to look behind the language of the enactment. In any event, committee minutes of statements by partisans, such as the executive director for the appellee, for instance, should be a last resort, rather than primary source, for statutory construction. Where comments of individual legislators are of "little weight" in determining legislative intent, *State v. Madison*, 163 Vt. 360, 373, 658 A.2d 536, 545 (1995), the views of lobbyists and advocates must weigh less still, lest one or a few purported spokespersons be relied upon, as here, to revise, add or erase a word or a phrase on behalf of the entire Legislature.

¶ 36. The statute as written does not apply to state correctional facilities. The Commission lacked jurisdiction to issue a subpoena to the Department. The trial court's statutory construction to the contrary,

and its denial of the Department's motion to quash, should be reversed. I am authorized to state that Chief Justice Reiber joins in this dissent.