2013 VT 76

## Thomas Kellogg v. Cindy Shushereba

[82 A.3d 1121]

No. 11-355

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed September 6, 2013

---

*Frank F. Berk*, South Royalton, for Plaintiff-Appellee/Cross-Appellant.

*Thomas Hayes* and *Susan J. Manley* of *Hayes & Windish*, Woodstock, for Defendant-Appellant.

¶ 1. **Dooley, J.** This case presents the difficult task of equitably resolving the fallout from a collapsed, unwritten real estate transaction. Both parties challenge the monetary award arrived at by the trial court, sitting in equity. We conclude that, although correct in some respects, the trial court's decision mistakenly treated the parties' agreement as though it were an agreement for rent. The decision is therefore affirmed in part, reversed in part, and remanded for further proceedings.

¶ 2. Plaintiff Thomas Kellogg owns a house and land on Christian Hill Road in Bethel. In roughly 1999, he entered into a rent-to-own agreement with William Oren — who is not a party to this case — whereby Oren would pay $180,000 over time for the property, at which point ownership would be transferred to him.

¶ 3. Not long thereafter, beginning for several months in 2000 and then from 2001 onwards, defendant Cindy Shushereba began to occupy the house with Oren in a romantic relationship. By August 2004, it was contemplated that defendant would come to co-own the property. Plaintiff indicated that he wished to come to an agreement to sell the property to defendant and Oren.

¶ 4. To that end, in August 2004, defendant liquidated her savings and paid plaintiff the sum of $41,793 as a downpayment on the house. Plaintiff again set the sales price at $180,000 and credited Oren and defendant with the $39,486 that Oren had paid in rent. These two contributions left roughly $98,721 to be paid to reach the purchase price. The parties agreed orally that the balance would be paid over fifteen years in the amount of $833 per month based on a six-percent interest rate. In addition, Oren and defendant agreed to be responsible for the real estate taxes

and the property insurance. No written purchase and sale agreement was ever prepared, but the parties intended that Oren and defendant would receive title immediately and give a mortgage secured by a promissory note for the installments. Oren was concerned about having his name appear on the deed due to outstanding tax debts, so a warranty deed, mortgage and promissory note were drawn up in defendant's name only. Plaintiff delivered the signed warranty deed to defendant, but defendant never signed the promissory note or the mortgage. Because defendant could not pay the property transfer tax that would be due on recording, she never recorded the warranty deed. Plaintiff testified that, at this time, he considered himself the mortgage holder only.

¶ 5. From 2004 until 2008, Oren made the $833 monthly payments. He also paid the property taxes until the final quarter of 2007 when plaintiff resumed paying the property taxes.[1] Ultimately, the relationship between Oren and defendant dissolved,[2] and, in May 2008, Oren moved out after defendant obtained a relief-from-abuse order against him.

¶ 6. A couple of months after Oren moved out, plaintiff and defendant became sexually involved. Although the parties dispute whether to characterize the relationship as "romantic," both parties testified that they regularly spent the night together at each other's residences from 2008 until 2010. During this time, plaintiff sought neither rent nor the purchase installments from defendant, and she made no payments. There was testimony that defendant unsuccessfully sought financing to complete the purchase. At some point in 2010, plaintiff began seeking rent from defendant, and she did make between two and four monthly rental payments of $650 at this time. Plaintiff paid the property taxes on the property throughout the time that defendant lived by herself in the house.

¶ 7. In 2008, not long after moving out, Oren brought suit against both plaintiff and defendant, seeking to be declared half-owner of the property along with defendant, from whom he sought a partition and accounting. Of relevance to this case,

---

[1] There is no indication what happened with respect to the payment of insurance costs.

[2] Although the romantic relationship apparently ended some time before, Oren and defendant both continued to occupy the house until 2008.

defendant filed a cross-claim — although erroneously styled as a counterclaim — in that action, seeking an order requiring plaintiff to execute a warranty deed in her name and seeking to be declared sole owner of the property.[3] In September 2009, the superior court rejected the claims of both Oren and defendant. In regard to defendant's cross-claim, the court concluded, "There is no testimony before the court that the parties ever agreed that [defendant] would be sold this property for $41,793.48, the amount which she has paid to [plaintiff] to date." Plaintiff testified that, even after this decision and despite the fact that defendant was not making payments, he still expected that defendant would, at some point, pay the remaining balance due on the purchase price. Defendant's testimony about her desire to buy the house was confused, but she stated on more than one occasion during her testimony that she still wished to purchase the house after the conclusion of the first lawsuit.

¶ 8. While defendant lived in the house, the water source for the residence — a spring dug many years earlier — had deficiencies that became acute beginning around 2007. The spring water was not potable due to a bacterial contamination producing high coliform levels. Furthermore, the water was extremely hard, which led to rust stains and mineral buildup in the appliances. Defendant testified that the water would turn her hair and laundry orange. Eventually, and over some resistance from plaintiff, defendant arranged to have a well dug, and she paid for this herself at a cost of $3992, plus $995 for the installation of a water pump. During her residency, defendant also paid $787 for roof repairs and $750 for repairs to a plumbing leak.

¶ 9. By August 2010, whatever relationship existed between plaintiff and defendant had ended. Plaintiff served defendant with an eviction notice alleging defendant owed $25,823 in back rent. As a result of this notice, defendant moved out of the property in early September 2010. In October 2010, plaintiff initiated this action for unpaid rent of $26,656, based on a "rent" of $833 per month for thirty-two months. At trial, plaintiff also sought compensation for the property taxes he paid during her residency and for the value of certain appliances and personal property that he alleged should have been left at the property.

---

[3] We have no explanation as to why defendant sought a deed when, according to the findings in both this case and the earlier case, she already possessed such a deed.

¶ 10. Defendant counterclaimed, contending that she owned the property or, in the alternative, that plaintiff had been unjustly enriched by defendant's payments to him. Prior to trial, the court dismissed as res judicata defendant's claim that she owned the property, leaving the unjust-enrichment claim in her counterclaim. At trial, defendant additionally contended that she was owed for various capital contributions that she had made and the value of certain personal property.

¶ 11. After a bench trial consisting entirely of testimony from plaintiff and defendant, the trial court ruled in favor of plaintiff's claims for back rent and property taxes, amounting to $40,063. Of this amount, $23,324 was awarded for rent, representing $833 per month from May, 2008 through August, 2010. The remaining $16,739 was awarded for property taxes, covering the last quarter of 2007 through eight months of 2010. However, the trial court ruled in favor of defendant with regard to her unjust enrichment claims for the return of the $41,793 downpayment on the purchase price and several of her alleged capital and repair contributions. The court concluded that defendant was owed $50,067 on the counterclaim, meaning defendant received a net judgment of $10,004.

¶ 12. Both parties appealed. Defendant argues that the court erred in finding an agreement that she would pay the property taxes and in finding that she owed $833 per month as rent. Plaintiff argues that defendant's unjust-enrichment claim should have been dismissed as res judicata or as securing an option that was never exercised and that defendant was not entitled to an offset for her capital contributions because she did not follow the statutory notice requirements before making the changes. In summary, plaintiff wants rent and property taxes for the period defendant occupied the property, without returning defendant's lump-sum payment or her capital contributions. Defendant wants return of the lump-sum payment and an amount equal to the capital contributions without paying any more for her occupancy after Oren left.

¶ 13. In reviewing the trial court's decision, we accept its findings of fact as long as they are supported by the record. See V.R.C.P. 52(a)(2); *Mann v. Levin*, 2004 VT 100, ¶ 17, 177 Vt. 261, 861 A.2d 1138 ("[W]e will uphold the court's factual findings unless, taking the evidence in the light most favorable to the prevailing party, and excluding the effect of modifying evidence,

there is no reasonable or credible evidence to support them."). We review the trial court's legal conclusions without deference, *Charbonneau v. Gorczyk*, 2003 VT 105, ¶ 2, 176 Vt. 140, 838 A.2d 117, but we give deference to the trial court's decision to grant or withhold equitable remedies, see *Weed v. Weed*, 2008 VT 121, ¶ 16, 185 Vt. 83, 968 A.2d 310.

¶ 14. We begin with defendant's assertions of error challenging the judgment amounts for rent and property taxes. The rental award was based on the assumption, not explored, that there was a landlord-tenant relationship between the parties because they had entered into a rent-to-own contract. The trial court's opinion is somewhat ambiguous on this point and is focused more on the nature of the payment, rather than the nature of the relationship. On the one hand, the trial court referred to "their informal and unwritten landlord-tenant arrangement" and states that "[r]ent . . . was $833 per month." On the other hand, the trial court found only that defendant "had agreed to pay $833 per month under the purchase-and-sale agreement" and that "[t]he parties did not seriously dispute that $833 per month was a reasonable amount of rent for the property in question." The trial court did not make the explicit finding that defendant agreed to pay $833 per month as rent.

¶ 15. ▪ We start by analyzing that assumption. In the recent decision of *Prue v. Royer*, 2013 VT 12, 193 Vt. 267, 67 A.3d 895, we described the difference between a contract for a deed and a lease purchase contract:

> A contract for deed is an agreement in which a "prospective purchaser occupies the premises and makes . . . payments until the point of delivery of the deed and execution of the mortgage." *Tromblay v. Dacres*, 135 Vt. 335, 339, 376 A.2d 753, 756 (1977). Such contracts are bilateral: both parties have duties to which they have already agreed and cannot choose not to perform without breaching the contract.
>
> A second important characteristic of a contract for deed is that the payments under such an agreement "are applied to the purchase obligation as they accumulate." *Id.* Therefore, under a contract for deed, there is an "accumulation of an equitable interest in the property

that deserves recognition even without the execution of a formal mortgage instrument." *Id.* at 340, 376 A.2d at 756.

A lease option to purchase, on the other hand, is " 'an agreement by which one binds himself to sell and convey to another party certain property at a stipulated price within a designated time, leaving it in the discretion of such other party to take and pay for the property.' " *Buchannon v. Billings*, 127 Vt. 69, 74, 238 A.2d 638, 641 (1968) (quoting *Durfee House Furnishing Co. v. Great Atl. & Pac. Tea Co.*, 100 Vt. 204, 207, 136 A. 379, 381 (1927)). It is a unilateral contract: " 'The optionor is bound that the offer shall be kept open and available in accordance with its terms, but its acceptance rests wholly in the discretion of the optionee, and there is no obligation upon the latter with regard to it.' " *Id.* (quoting *Durfee*, 100 Vt. at 207, 136 A. at 381).

Besides its unilateral nature, the other main way in which a lease option is distinguished from a contract for deed is that the lease payments are "not . . . applied on the purchase price." *Tromblay*, 135 Vt. at 340, 376 A.2d at 756. Therefore, no equity is accrued. See *Harden v. Vt. Dep't of Taxes*, 134 Vt. 122, 125, 352 A.2d 685, 687 (1976) (citing *LaGue v. State*, 128 Vt. 212, 214, 260 A.2d 387, 389 (1969)).

*Id.* ¶¶ 21-24.

¶ 16. ▮▮ We agree that Oren's initial oral understanding with plaintiff involved a lease purchase contract. But the oral contract made in 2004 between plaintiff, Oren, and defendant changed the nature of the agreement. The 2004 agreement was bilateral, and defendant accrued equity as she made payments. As we found in *Prue*, a contract for deed is a form of equitable mortgage.[4] *Id.* ¶ 29. Plaintiff understood that his legal relationship with defendant was that of mortgagee and mortgagor.

---

[4] It is, of course, an equitable mortgage because the mortgagee and mortgagor have not taken the steps to turn the arrangement into a mortgage recognized at law — creating deeds to be exchanged and filing them in the land records. The fact that the mortgagee in this case took one of the steps — the delivery of a deed to the mortgagor — does not change the legal interests of the parties. Plaintiff as mortgagee had an equitable mortgage based on a contract for a deed.

¶ 17. We conclude that the contract between plaintiff and defendant was a contract for deed[5]; the trial court erred in concluding it was a landlord-tenant relationship.[6] Although "[t]he existence of an agreement is ordinarily a question of fact for the trier," *Town of Rutland v. City of Rutland*, 170 Vt. 87, 90, 743 A.2d 585, 587 (1999), the question here is about legal interpretation of whatever hazy agreement existed between the parties, namely, whether that agreement constituted a rental agreement. Cf. *O'Brien Bros.' P'ship, LLP v. Plociennik*, 2007 VT 105, ¶ 9, 182 Vt. 409, 940 A.2d 692 ("The interpretation of an unambiguous contract is . . . a question of law, which we review de novo."). We conclude that the understanding described by both parties is not, as a matter of law, a rental agreement. To the extent that the trial court and both parties' briefs before this Court treat this case as, in part, governed by landlord-tenant law, we consider that to be in error. See generally 2 Wolf, *supra*, § 16.02[3][b][iv], at 16-26 to 16-27; W. Shipley, Annotation, *Vendee's Liability for Use and Occupancy of Premises, Where Vendor Disaffirms an Unenforceable Land Contract*, 49 A.L.R.2d 1169, § 1[b] (1956) ("[I]t seems clear that a vendor in the situation discussed should not be allowed to recover from the purchaser for the use and occupation of the land under any theory of implied contract of renting, since clearly the vendor-vendee status of the parties under the supposed contract is inconsistent with the implication of a landlord-tenant relationship, at least until the vendor puts the purchaser on notice that he will not honor the contract. So, it has usually been held that the vendor cannot obtain an affirmative judgment for rent in

---

[5] The dissent rejects this conclusion as well as the trial court's conclusion that a landlord-tenant relationship was created, labeling the relationship colloquially a "mess." *Post*, ¶ 50. Although we acknowledge the difficulty of describing the relationship in definitive legal terms, we differ on whether we can avoid the question and apply general equitable principles. It is our duty as the highest court of Vermont, creating binding precedent, to fit the messy happenings of informal agreements into predictable rules.

[6] We recognize that a landlord-tenant relationship may have been created in 2010 when plaintiff demanded rent from defendant and defendant paid some rent, albeit not in the amount of $833 per month. A landlord-tenant relationship can exist with a contract for deed, if there is such an agreement. See 2 M. Wolf, Powell on Real Property § 16.02[3][b][iv], at 16-26 to 16-27 (2012). The trial court did not find that a landlord-tenant relationship was created in this way in 2010, and it held defendant liable for $833 per month, less the amount actually paid, for the entire period until defendant left. The possible existence of a short-term landlord-tenant relationship at the end of defendant's occupancy does not change our analysis.

an independent action against the purchaser for use and occupation.").

¶ 18. Because the agreement between plaintiff and defendant was a contract for deed, the amount of $833 per month that defendant had agreed to pay plaintiff went entirely toward the purchase price plus interest. When the periodic payments were complete, defendant would become the owner of the property, free and clear of any interest of plaintiff, without a further payment. There was not an agreement to pay rent[7]; the $833 monthly payment was not part of a rental agreement between plaintiff and defendant.

¶ 19. ■ While the parties intended a contract for deed, this agreement did not comply with the Statute of Frauds, as concluded in the earlier litigation. See 12 V.S.A. § 181 (requiring that an action on a real estate contract cannot be brought unless the agreement is in writing and signed). This does not make the parties' agreement irrelevant. Unenforceability under the Statute of Frauds does not render an agreement void. See, e.g., *Bedell v. Tracy*, 65 Vt. 494, 499, 26 A. 1031, 1032 (1893) ("The contract was executory, unwritten, and related to real estate. No action of law nor in equity could be maintained upon the naked contract, either to enforce it or to recover damages for non-performance of its provisions. The contract was not unlawful, but its enforcement is forbidden by statute."); *Shaw v. Shaw*, 6 Vt. 69, 75 (1834) ("The statute does not declare such parol contracts void. It only provides that no action shall be maintained thereon . . . ."); see generally Restatement (Third) of Restitution & Unjust Enrichment § 31(1)(b) (2011); 2 G. Palmer, The Law of Restitution § 6.1(b), at 5 (1978) ("Restitution does no violence to the provisions of the Statute of Frauds or to its purposes . . . ."). Failure to conform to the Statute of Frauds does not prevent recovery based on unjust enrichment, rather than breach of contract. *Cliche v. Fair*, 145 Vt. 258, 262, 487 A.2d 145, 148-49 (1984).

---

[7] Plaintiff alleges that defendant agreed to pay the property taxes on the home, a claim which the trial court accepted but which defendant denies on appeal. As discussed further below, see *infra*, ¶ 24, this could conceivably be considered a rental payment. We doubt that either party considered the payment of the property taxes to be the agreed-upon rent. But more telling is the fact that the remainder of the agreement cannot plausibly be read as merely an option contract.

¶ 20. ▮ First, plaintiff seeks back rent from defendant. Because this was not a landlord-tenant relationship, plaintiff's claims for back rent are incorrectly framed. To the extent that the trial court found in plaintiff's favor on this claim,[8] its judgment was erroneous. *Nelson v. Gibson*, 90 Vt. 423, 430, 98 A. 1006, 1009 (1916) (explaining that an agreement to pay rent is necessary to enable one to recover rent); *Adams v. Cooty*, 60 Vt. 395, 397, 15 A. 150, 151 (1888) (same); *Clark v. Clark's Adm'r*, 58 Vt. 527, 529, 3 A. 508, 510 (1886) ("It is well settled that to lay the foundation for a recovery in assumpsit for use and occupation of real estate, the relation of landlord and tenant must exist under a contract, expressed or implied."). Because no rental agreement existed, plaintiff cannot obtain relief in the form of back rent.

¶ 21. This is not to say that plaintiff has no avenue for relief. Plaintiff is entitled to relief based on defendant's occupation of the premises, even though he is not entitled to back rent where no rental agreement existed. Cf. *Haberman v. Singer*, 710 N.Y.S.2d 64, 64 (App. Div. 2000) (mem.) (holding that claim for back rent was properly dismissed where no rental agreement existed and that landlord's proper remedy was via a quantum meruit claim).

¶ 22. ▮ There are two ways to look at plaintiff's recovery, and they lead to the same result. The first is that plaintiff is entitled to recovery for unjust enrichment. "Under the doctrine of unjust enrichment, a party who receives a benefit must return the [benefit] if retention would be inequitable. Unjust enrichment applies if 'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 41, 178 Vt. 244, 882 A.2d 1177 (quoting *Brookside Mem'ls, Inc. v. Barre City*, 167 Vt. 558, 560, 702 A.2d 47, 50 (1997) (mem.)). Here, defendant received the benefit of living in plaintiff's home without

---

[8] We note that the trial court's citation to *Center v. Mad River Corp.*, 151 Vt. 408, 412, 561 A.2d 90, 93 (1989), suggests that the decision could be read as basing plaintiff's recovery on equitable considerations of unjust enrichment, which would accord with this opinion's guidance. We conclude, however, that the court was referring to defendant's recovery and not to plaintiff's recovery. Although we would prefer to interpret the trial court's opinion liberally and affirm on those grounds, we are unable to do so. The trial court explicitly held that defendant "owes in rent and agreed-upon taxes." The court did not attempt to calculate the benefit that defendant received by virtue of her use and occupancy of the property, but instead assumed that defendant owed the amount of the anticipated payments as rent.

paying for that benefit. In these circumstances, the retention of the benefit is unjust. Defendant must pay back the value of the benefit.

¶ 23. ■ The second takes us back to plaintiff's complaint. Although plaintiff styled his action as one for eviction, it is more properly viewed as a common law action for ejectment governed by 12 V.S.A. § 4761, with such "damages" as would be due under 12 V.S.A. § 4765.[9] We have explained that the reference to "damages" in that context refers to "mesne profits."

> Mesne profits at common law were the pecuniary gains and benefits received by the disseizor during his unlawful occupancy, and the term is commonly used to denote the damages recoverable in ejectment. These may be measured by the rental value of the premises, or they may be more. When the rental value, alone, compensates the plaintiff, it governs the award of damages; when that value falls short of such compensation, it does not. Compensation being the basis of the recovery, the wrongdoer must respond for gains prevented as well as for losses sustained, so far as the same are sufficiently alleged and proved.

*Sabourin v. Woish*, 117 Vt. 94, 99, 85 A.2d 493, 497 (1952); see also *Capital Garage Co. v. Powell*, 98 Vt. 303, 306-07, 127 A. 375, 377 (1925) (holding that statute that is now § 4765 blended ejectment action with action for trespass for mesne profits).

¶ 24. In this context, mesne profits, recoverable in ejectment, and the monetary recovery available in the case of unjust enrichment are identical. See 1 D. Dobbs, Law of Remedies § 5.8(2), at 788 (2d ed. 1993). On remand, the trial court should treat plaintiff's complaint — in particular the prayer "for such other and further relief as the Court deems just and proper" — as a claim for mesne profits under a theory that defendant has held

---

[9] We do not view it as significant that the main purpose of the action was settled, leaving the damages aspect unresolved. The ejectment statute provides that if plaintiff receives judgment for ejectment, he shall recover his damages as well as possession. 12 V.S.A. § 4765. We do not read the statute as providing that defendant can avoid a damages judgment by leaving the property so that no ejectment is required.

the property without right.[10] This will involve — but is not necessarily limited to[11] — a factual inquiry into the fair market value that defendant received by virtue of her occupancy of plaintiff's property.[12] The amount of $833 per month that was agreed to go toward purchase of the property does not control this inquiry.

¶ 25. In addition to back rent, plaintiff seeks reimbursement for the property taxes paid by him during defendant's residency, alleging that there was an agreement that defendant would pay the property taxes.[13] The trial court agreed and ordered that defendant compensate plaintiff for the property taxes paid during her time living at the property. Defendant responds with essentially two arguments. First, defendant contends that, regardless of what agreement existed with respect to property taxes between plaintiff and Oren, no such agreement existed between plaintiff and defendant.[14] Second, defendant argues that, even if there had

---

[10] On appeal, defendant seeks to block certain claims made by plaintiff on the grounds that they were not pled in plaintiff's complaint. It is true that plaintiff's complaint did not specifically request the relief considered herein, although he did pray for "such other and further relief as the Court deems just and proper." Even assuming that this was inadequate, defendant's counterclaim for unjust enrichment opened the door to plaintiff seeking an offset. See *Blanchard v. Knights*, 121 Vt. 29, 37, 146 A.2d 173, 178 (1958) ("[H]e who seeks equity must do equity.").

[11] The trial court may, for example, consider the benefit to defendant and the opportunity cost to plaintiff of the indefinite delays in closing. We acknowledge plaintiff's position that defendant may have received some value from the open-ended purchase agreement and that plaintiff may have lost potential profits. We reject, however, plaintiff's resulting contention that defendant's downpayment was simply the price of an option that she chose not to exercise. The recoverable mesne profits in this case must also consider improvements under 12 V.S.A. § 4814, as explained *infra*, ¶¶ 42-43.

[12] Plaintiff's recovery should cover the period commencing in the first month after Oren made a payment and continuing through the month in which defendant vacated the premises. Defendant should receive an offset for the rent she paid in 2010.

[13] Defendant argues that plaintiff never requested reimbursement for property taxes, that such a request should have been made during the previous lawsuit and is therefore precluded by the doctrine of res judicata, and that the trial court's award regarding property taxes constituted "a gift to Kellogg." For the reasons stated in note 5, *supra*, and ¶¶ 29 and 30, *infra*, we reject these arguments, even though we ultimately reverse the trial court's order for reimbursement of the property taxes.

[14] In support of this claim, defendant emphasizes that Oren moved out after plaintiff resumed paying the property taxes, which defendant views as refuting the

been such an understanding, it would be unenforceable under the Statute of Frauds and was voided as a nullity by the decision in the previous lawsuit.

¶ 26. As with earlier issues, the trial court decision and the arguments of the parties are based on the premise that the relationship between the parties is one of landlord and tenant and the item in controversy is a component of rent. Having found that the monthly payments were not rent, we find no ground to distinguish the payment of property taxes. Payment of property taxes is part of the purchaser's obligation to obtain title to the property free and clear of the interest of the seller.

¶ 27. ▇ Viewed in the proper perspective, the property taxes are an unsegregated component of mesne profits to which plaintiff is entitled, as we held above. The "rental value" of property includes expenses as well as whatever return on investment the lawful owner can obtain in the market. It would be error for the court to award property taxes in addition to mesne profits.

¶ 28. ▇ We turn next to defendant's counterclaim for unjust enrichment seeking return of her downpayment. Plaintiff argues that defendant's counterclaim should have been precluded because defendant should have litigated this issue in the earlier lawsuit.[15] See *Iannarone v. Limoggio*, 2011 VT 91, ¶¶ 14-15, 190 Vt. 272, 30 A.3d 655 (explaining that res judicata covers not only claims that

presence of any agreement during the period of defendant's residency. Defendant argues that the trial court's finding to the contrary was erroneous. The relevant finding of the trial court stated, "[b]eginning after Mr. Oren moved out in 2007, plaintiff paid the real-estate taxes for the property, . . . [starting with] the final quarter of the 2007 tax year . . . ." We agree that the record does not support the finding that Oren moved out in 2007. Plaintiff testified that Oren moved out in May 2008, and defendant agreed that it was sometime after the end of 2007. We disagree, however, that this erroneous factual finding undermines the trial court's award of property taxes. Regardless of when Oren moved out, the trial court found that defendant was party to the original agreement contemplating the payment of the property taxes and that defendant eventually assumed sole responsibility for the purchasing side of this arrangement.

[15] Plaintiff also argues that, even absent the alleged procedural bar, the $41,793 should not have been returned to defendant because it was the price paid for an option to purchase, which was never exercised even though it could have been. As already discussed, we reject the interpretation of the agreement between plaintiff and defendant as a lease-option arrangement. In addition, both the trial court in this action and the trial court in the previous action found that the payments were intended to go towards a purchase price of $180,000.

were litigated, but also claims that should have been previously litigated).

¶ 29. Although styled as a counterclaim, defendant's action in the previous lawsuit was a cross-claim because plaintiff and defendant were codefendants. Cross-claims are permissive. See V.R.C.P. 13(g). As such, defendant was not required to raise her potential claims against plaintiff in the previous lawsuit. See 6 C. Wright et al., Federal Practice and Procedure § 1431, at 275-76 (3d ed. 2010) (explaining that cross-claims are always permissive and that a party who decides not to bring his claim will not be barred by res judicata, waiver, or estoppel from asserting it in a later action).

¶ 30. Defendant did, however, assert claims against plaintiff in the first lawsuit — she sought to be declared owner of the property and she sought an order that a deed be conveyed to her.[16] In making this cross-claim, defendant even noted that plaintiff would be "unjustly enriched" if she were not declared owner. Once defendant raised her cross-claim — which she was not required to do — she essentially became a second plaintiff in the original litigation. To the extent that defendant's unjust-enrichment claim was available to her at that time, she may be precluded from raising it here, as she would be if she had been plaintiff rather than codefendant in the original action. See *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 209 (Tex. 1999) ("In the earlier . . . suit [party 1] and [party 2] were co-defendants, and [party 1] chose to file a permissive cross-claim against [party 2] based on indemnification language in their contract. By taking this action [party 1] put itself in the same position, for purposes of *res judicata*, as a plaintiff filing a cause of action for damages. . . . As the plaintiff for *res judicata* purposes, [party 1] was subject to the general rule of *res judicata* that any cause of action that arises out of the same subject matter should, if practicable, be litigated in the same lawsuit."); see also *Trans Helicoptere Serv. v. Jet Support Servs., Inc.*, No. 03 C 0498, 2004 WL 2921856, at *7 (N.D. Ill. Dec. 14, 2004) ("While the initial filing of a crossclaim in an action is permissive, once the

---

[16] Plaintiff and defendant engage in some argument concerning the preclusive effect of an action seeking declaratory relief plus some accompanying coercive relief. We need not reach this question because we conclude that defendant's unjust enrichment argument was not yet ripe at the time of the previous lawsuit and thus is not barred. See *infra*, ¶ 31.

cross claim is filed, it is a claim like any other claim in an action.").

¶ 31. We conclude, however, that the trial court was correct in allowing defendant's unjust enrichment claim. In the earlier action, defendant was not attempting to have the court determine that the agreement had been terminated, and the court did not so find — it found merely that the agreement did not provide that defendant should get a warranty deed after having paid only $41,493. Both defendant and plaintiff testified at trial for this case that even after the earlier decision, they intended to continue with the sale. Unjust enrichment is present only if: "(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." *Mad River Corp.*, 151 Vt. at 412, 561 A.2d at 93. Thus, defendant's unjust-enrichment claim was not yet ripe at the time of the first decision, for she was still living on the land, and it was not yet clear either if defendant was going to follow through with the agreement to purchase the land or if plaintiff was going to take any action to eject her from the land. "If a second claim has not ripened when the first claim is filed, res judicata does not bar the second claim." *Schenden v. Addison Twp.*, No. 244389, 245805, 2004 WL 1908231, at *4 (Mich. Ct. App. Aug. 26, 2004) (per curiam). The claim came into existence only after the resolution of the first case, when defendant continued to not make the monthly payments and plaintiff brought his eviction action. Consequently, defendant is not barred from bringing it now.

¶ 32. Although we find that the trial court was correct to reach the unjust enrichment claim, we disagree with its conclusion. The existence of unjust enrichment, given a certain set of facts, is a question of law that we review de novo. See *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 903 (Mich. Ct. App. 2006) (noting that "[w]hether a specific party has been unjustly enriched is generally a question of fact," but "whether a claim for unjust enrichment can be maintained is a question of law, which we review de novo" (citations omitted)). Turning to the law, we conclude that this case is squarely controlled by *Cobb v. Hall*, 29 Vt. 510 (1857). In that case, the question confronting this Court was the following: "[W]hether the party paying part of the

purchase money of an estate, when the contract is within the statute of frauds, may, at his election, and while the other party is ready and willing to perform on his part, recover it back." *Id.* at 513. The answer in that case was a resounding "no": "[S]o long as the party agreeing to convey is ready and willing to perform, he is not liable to any action, either at law or in equity, for anything done under the contract." *Id.*; see also *Bedell*, 65 Vt. at 499, 26 A. at 1032 ("[I]f the vendor [in a contract for the sale of land unenforceable under the Statute of Frauds] is ready to perform, no recovery of the price, or of part of the price paid, can be had."); *Shaw*, 6 Vt. at 76 ("[The vendee in a contract for the sale of land unenforceable under the Statute of Frauds] cannot repudiate the contract and recover back what she has paid thereon, the [vendor] having never refused to complete the same.").

¶ 33. ▮▮▮ This is a nearly universal rule.

"According to the great weight of authorities, . . . the vendee of real property under an oral contract which is within the statute of frauds may not recover partial payment of the purchase price which he has paid pursuant to the agreement, in the absence of fraud, while the vendor is ready, able and willing to fulfill the terms and conditions of the contract."

10 R. Lord, Williston on Contracts, § 27:31, at 254 (4th ed. 1999) (quoting *Thompson v. Schurman*, 150 P.2d 509, 512 (Cal. Ct. App. 1944)); see generally R. Fox, Annotation, *Vendor's Willingness and Ability to Perform Contract Which Does Not Satisfy Statute of Frauds as Precluding Purchaser's Recovery Back of Payments Made Thereon*, 169 A.L.R. 187 (1947). This nearly universal rule is the Statute-of-Frauds-context cousin of a rule applicable to enforceable contracts[17] whereby, in the words of Professor Corbin:

---

[17] That the rule should be the same in the enforceable-contract and unenforceable-contract context is natural — Professor Palmer explains that "the two situations should be governed by a single rule, at least as to restitution of payments on the price." 2 Palmer, *supra*, § 6.6, at 47. He justifies that statement by pointing out that "when the plaintiff . . . is the breaching party, restitution is his only possible remedy in either event, whether the contract is enforceable or unenforceable." *Id.* This is not the case in Vermont, as a defaulting purchaser on an enforceable contract for deed is entitled to the equitable remedy of foreclosure — a remedy not available without an enforceable contract. See *Prue*, 2013 VT 12, ¶ 29.

Neither by a repudiation nor by mere failure to pay other instalments, when due, can the vendee terminate the vendor's right to payment of the full price — his right to specific performance, his right as holder of a lien for the purchase price. As long as the vendor continues to assert these rights and to remain ready and willing to make conveyance as agreed, the defaulting vendee has no right of restitution; he cannot recover back money that he has paid if it is money that the vendor could still compel him to pay if as yet unpaid.

A. Corbin, *The Right of a Defaulting Vendee to the Restitution of Instalments Paid*, 40 Yale L.J. 1013, 1018 (1931).

¶ 34. ■ The question in this case, then, should have been whether plaintiff was to be considered ready and willing to make the conveyance. Of course, it will be noted that this lawsuit began when plaintiff filed an eviction action to remove defendant from his land — an action incompatible, some might say, with being "ready and willing" to perform under the (unenforceable) contract. To so simply interpret his actions, however, would be to make an untenable rule that a vendor may never take any actions to remove a defaulting vendee after that party's default. Courts have managed to avoid such a rule by finding that, even when a vendor has taken actions to remove defaulting vendees from the land or even more significant actions such as mortgaging or selling the land in question to another, "restitution may still be denied on the ground that the [vendor] had already remained willing and able to perform for a sufficient period of time." L. Jeanblanc, *Restitution Under the Statute of Frauds: What Constitutes an Unjust Retention*, 48 Mich. L. Rev. 923, 956 (1950); see *Kenniston v. Blakie*, 121 Mass. 552, 554 (1877) (finding that, under oral contract for

Nonetheless, we have through our cases chosen to follow this "nearly universal" rule in the unenforceable-contract context.

The dissent sees tension between the result in the enforceable-contract and unenforceable-contract cases. As we say above, the remedies cannot be equalized, and neither involves recovery of a downpayment as the dissent urges. In any event, the "tension," if any, preexists this case, as the dissent acknowledges. *Post*, ¶ 54 n.23.

The "divergence from the national pack" which the dissent asserts should make our precedents "outdated and unhelpful" is really a divergence that other states have made from the continuous path that Vermont has maintained. *Post*, ¶ 54. Our older precedents are entirely consistent with the development of Vermont law.

deed where vendee was in possession, when vendee refused to continue with his payments and vendor ordered him off the land, vendor's actions did not mean that he was not prepared to follow through with agreement and his retention of vendee's downpayment was therefore not unjust); *Durham Consol. Land & Improvement Co. v. Guthrie*, 21 S.E. 952, 954 (N.C. 1895) (holding that vendor's disposal of land more than twelve months after vendee's default on a land contract within the Statute of Frauds did not mean that vendor was not willing and able to convey, because "it would have been unreasonable to require [vendors] to hold their property in an unproductive state until it suited the pleasure of the [vendee] to make the first move").

¶ 35. In this case, after making the downpayment, defendant made no further payments to plaintiff, and despite testimony at trial that she still intended to continue with the purchase of the property after the resolution of the first suit, and that plaintiff was willing and able to convey, defendant took no action towards that goal. Plaintiff was willing to convey, at least for a certain period of time after the first case was concluded. If defendant was not going to cure her default, he had to be free at some point to take action to remove defendant from the land without subjecting himself to a restitution claim. The first case was resolved in September 2009, and plaintiff served defendant with the eviction notice nearly a year later, in August 2010. Plaintiff styled it as an eviction action, but, as explained above, it is most appropriately viewed as an ejectment action. Instituting that action does not, on its own, determine whether plaintiff was willing and able to convey.

¶ 36. Apart from testimony and evidence about the eviction/ejectment action, and despite the trial court's announcement that one of the two focuses at trial was on defendant's unjust enrichment claims, no evidence was presented at trial as to whether plaintiff was ready and willing to convey the property, even after the default. Such evidence would likely have had to do with whether plaintiff had remained ready and willing to convey the property *for a sufficient period of time* before commencing his eviction/ejectment action. This leads us to the question of whose burden of proof it is to show that a vendor is unwilling to perform. The burden of proof in unjust enrichment claims lies with the party making the claim. See *Mad River Corp.*, 151 Vt. at 412-13, 561 A.2d at 93; see also *Trenwick Am. Reinsurance Corp.*

*v. W.R. Berkley Corp.*, 54 A.3d 209, 218 (Conn. App. Ct. 2012) ("It is the plaintiff's burden to prove the elements of a claim of unjust enrichment . . . ."). Therefore, since the unwillingness of the vendor to convey is a necessary element of the unjust enrichment claim, the burden to prove that fact must lie with the vendee. See *Kofmehl v. Baseline Lake, LLC*, 275 P.3d 328, 337 (Wash. Ct. App. 2012) (stating that because "[e]stablishing that [the vendor] was not ready, willing, and able to perform as agreed is a necessary element of [the vendee's unjust enrichment] claim," the vendee must bear that burden), *aff'd*, 305 P.3d 230 (Wash. 2013).

¶ 37. ■ Given the absence of evidence regarding plaintiff's ability and willingness to convey the property after defendant's default, the trial court erred in its legal conclusion that plaintiff had been unjustly enriched. We must reverse on this issue.

¶ 38. ■ Before moving on, however, we note that the rule established in *Cobb v. Hall* and followed above — that a purchaser who defaults on a contract for deed unenforceable under the Statute of Frauds cannot recover back payments on the purchase price if the vendor is willing and able to convey — may not be justified if the defaulting purchaser would be forced to forfeit an excessively high percentage of the purchase price. In such a situation, the enrichment of the vendor might be so great that we would find it to be unjust, notwithstanding the vendor's continued willingness to proceed with the oral contract. Other states have analyzed this conundrum as it arises both in the unenforceable-contract context and in the enforceable-contract context (where the installment contract often includes a forfeiture clause), because in most states a defaulting purchaser on an enforceable contract for deed cannot force foreclosure as the purchaser can in Vermont, and may only pursue restitution through an unjust-enrichment claim. See *Prue*, 2013 VT 12, ¶ 30; 2 Palmer, *supra*, § 6.6, at 47. The question is the same in all of these circumstances — because the vendor has not defaulted, the well-established rule is that the defaulting vendee may not recover, but the percentage of the purchase price to be forfeited may be simply too high to accept. Professor Palmer described this problem in the following way in the enforceable-contract context:

> The most troublesome problem arises in this setting: the vendor has received *substantial payments on the price*, he is in possession of the land to which he also has title,

and he is content to remain passive by retaining both the land and the purchaser's payments. He has no desire, that is, to obtain specific performance. Will he be permitted to defeat the purchaser's restitution action on the ground that restitution will destroy his right to specific performance, a right which he has no intention of asserting? There is a need to develop some technique by means of which the vendor's assertion of a right to specific performance cannot be used merely for the purpose of retaining an unjust benefit.

1 Palmer, *supra*, § 5.7, at 609-10 (emphasis added). He went on to describe a Maryland case, *Quillen v. Kelley*, 140 A.2d 517 (Md. 1958), to demonstrate that the principle of not allowing restitution when the vendor is ready and willing to convey cannot be blindly applied without looking at the amount of the purchase price already paid:

[T]he purchaser defaulted after paying $22,500 on a price of $245,000, and the vendor, who was in possession, took no steps to terminate the purchaser's rights on the contract. . . . [R]estitution was denied partly for the reason that "there is no right to restitution so long as the vendor is entitled to specific performance". . . . The reasoning would seem to be equally applicable had the purchaser paid $100,000 instead of $22,500, yet the demands of justice do not permit the retention of a clearly unjust enrichment in order to protect a theoretical right of the vendor which he asserts merely for the purpose of retaining the enrichment.

1 Palmer, *supra*, § 5.7, at 610 (quoting *Quillen*, 140 A.2d at 521).

¶ 39. A number of courts in other jurisdictions have dealt with this problem — in either the unenforceable-contract context or enforceable-contract context (with or without a forfeiture clause) — by making the percentage of the forfeiture a factor in analyzing whether unjust enrichment exists. See *Hook v. Bomar*, 320 F.2d 536, 541 (5th Cir. 1963) (applying Florida law and noting the importance of the "ratio . . . between down payment and purchase price" in determining unjust enrichment in case of defaulting vendee); J. Pearson, *Modern Status of Defaulting Vendee's Right to Recover Contractual Payments Withheld by Vendor as Forfeited*, 4 A.L.R.4th 993, § 2 (1981) ("In the cases

involving a forfeiture provision but no resale of the property after the vendee's default, an important factor in determining the right of the vendee to a refund is the percentage of the purchase price that had been paid at the time of the default. . . . [T]here has been an increased incidence of the vendee's recovering at least part of his payments as the percentage that such payments constitute of the purchase price increases.").

¶ 40. ▮ We will also take the percentage of the purchase price paid into consideration in determining whether a vendor has been unjustly enriched. In this case, that consideration does not alter the outcome. The percentage of the payment to be forfeited here was $23.22\%$[18] — high, but not high enough to find that the enrichment was clearly unjust, given that we approved a similar forfeiture in *Cobb*, where the payment forfeited was $100 of a $450 purchase price (22.22%). 29 Vt. at 510.

¶ 41. ▮ Lastly, defendant sought to recover for various repairs and improvements to the property, also on a theory of unjust enrichment. The trial court found in defendant's favor for some, but not all, of the claimed repairs and improvements. The award was for improvements to the roof, plumbing, well, and water pump, for a total of $6,324. On appeal, plaintiff contends that the trial court's finding in defendant's favor was erroneous because defendant failed to provide plaintiff with statutory notice before making the repairs and improvements. The statute upon which plaintiff relies requires that a tenant give a landlord notice before making repairs so that the landlord has an opportunity to cure the defects. See 9 V.S.A. § 4458. This was not a landlord-tenant relationship, so the statute cited does not apply. The failure of defendant to give notice under the statute is not a bar to recovery based on unjust enrichment. Accordingly, we must uphold the trial court's judgment for the improvements against the only challenge plaintiff made.[19]

---

[18] Defendant paid $41,793 of a total agreed purchase price of $180,000. We do not take into account in making this calculation the payment for mesne profits that is to be assessed against defendant on remand, as those payments were not forfeited but instead were for defendant's use of the land during the times in question.

[19] In relying upon nonpreservation, we are not ruling on whether reimbursement for improvements is available as a matter of right. Professor Palmer notes that restitution for such improvements is rarely granted to a defaulting purchaser in either the enforceable-contract or unenforceable-contract context, and "[t]he central

¶ 42. In leaving the award in place, we recognize there is an interaction between plaintiff's recovery of mesne profits and defendant's unjust enrichment recovery. As noted above, the measure of mesne profits is the value of the occupancy of the premises. The trial court awarded defendant recovery expenses "necessary to the continued habitability of the home." The main items in the award were for the cost of a new well and pump to replace a well that did not produce potable water and caused rust stains and mineral buildup in appliances. Other expenditures were for roof and plumbing repairs.

¶ 43. The interrelationship between mesne profits and the cost of improvements made by the occupant is governed by 12 V.S.A. § 4814, which provides that the amount of mesne profits awarded must be "just and equitable, in view of the improvements made" by the occupant. We applied this statute in Birkenhead, 143 Vt. 167, 465 A.2d 244, which is relevant here. In Birkenhead, a landlord-tenant case, we allowed the tenant to offset the cost of improvements[20] against back rent owed to the landlord, relying on § 4814. Id. at 174, 465 A.2d at 247. We held that the jury-awarded

fact is that the improvements were unsolicited." 2 Palmer, supra, § 6.6(a), at 49 n.10. He concludes that the justification for such relief is particularly weak in the unenforceable-contract context, citing a Kentucky case, Shreve v. Grimes, 14 Ky. (4 Litt.) 220, 1823 WL 1259 (1823), for the following explanation:

> [I]f the purchaser should choose to live upon the land at such an uncertainty, and should make such amelioration, and should himself disaffirm the contract and never offer to fulfil it, and cast the improvements made upon the hands of his adversary, and thus attempt to make him a debtor in that amount, against his consent, and without his default, the right to recover the value of improvements, in such case, would be very problematical.

Id. at *3. This Court cited approvingly that very Kentucky case in Bedell, explaining its holding in the following way: "[A] purchaser of real estate, under a parol contract, which is not enforceable, cannot recover on implied assumpsit for improvements made on the estate." 65 Vt. at 503, 26 A. at 1033.

Recovery for improvements, under the label of betterments, is governed by statute, 12 V.S.A. §§ 4811-4824. We rely upon § 4814, but note that the basic entitlement to an award for betterments is governed by 12 V.S.A. § 4811. We do not decide whether § 4811 applies in this case or would produce a result different from that produced by § 4814, as interpreted in Birkenhead v. Coombs, 143 Vt. 167, 465 A.2d 244 (1983). See infra, ¶ 43.

[20] Although the court used the term "improvements" in Birkenhead, the expenses were for repairs necessary to make the premises habitable. In this case, the trial court provided recovery for expenses necessary to provide habitability, rejecting

damages could include both the cost of the improvements and an offset to the rent before the improvements were made to reflect the diminished value of the property. *Id.* Section 4814 also applies to cases that do not involve a landlord-tenant relationship.[21] Applying § 4814 to this case, in light of *Birkenhead*, the trial court can offset the cost of the improvements against the mesne profits owed to plaintiff, as well as reduce the monthly mesne profits for the periods when the repairs or improvements were needed, but not made. Here, the award for the improvements has already been made so it would be a double recovery to allow them through an offset to mesne profits. On remand, the court can consider the need for the improvements, before they were made, as bearing on the mesne profit award for any given month.

*Affirmed in part, reversed in part, and remanded for further proceedings.*

¶ 44. **Robinson, J.,** concurring in part, dissenting in part. The majority concludes that in sorting out the equitable claims between the parties, the trial court should require defendant to reimburse plaintiff for the value of defendant's occupancy of the premises for approximately six years, and should credit defendant for some expenditures she made to keep the house habitable and for a brief period of rental payments, but should not, as a matter of law, consider the substantial payments defendant and her then-housemate Oren paid plaintiff in connection with the purchase of the property — including defendant's $41,793 payment to plaintiff. In essence, the majority concludes that in cooking this equitable stew, the trial court should leave out one of the most important ingredients. From an equitable perspective, the resulting concoction just doesn't taste right.

¶ 45. The majority reaches three subsidiary conclusions on the path to its ultimate holding on this issue. First, it concludes that the underlying transaction between the parties was actually an unwritten contract for a deed. Second, it concludes that the purchaser in such an unwritten contract for a deed generally is

some expenses the court found did not meet that standard, essentially using the same standard as the Court used in *Birkenhead*. Thus, to the extent that we found that § 4814 applied to the expenses in *Birkenhead*, we must find that the statute applies to the expenditures in this case.

[21] The special provisions for landlord-tenant ejectment actions are 12 V.S.A. §§ 4851-4856.

not entitled to a return of payments made toward the purchase if the purchaser defaults while the seller remains ready and willing to perform. Third, it concludes that the dollars at stake in this case are not sufficiently high relative to the overall purchase price to take this case out of that general rule. I disagree with each of these conclusions, and respectfully dissent from the majority's holding that defendant is not entitled to consideration in the equitable calculus for the downpayment she made to plaintiff.

¶ 46. I should say at the outset that I do agree with the majority that the relationship between the parties cannot be properly characterized as one between landlord and tenant. But I believe the majority's own attempt to squarely fit the transactions before us into a recognized legal box is also unavailing.

¶ 47. Consistent with the trial court's findings, and the evidence supporting them, the majority describes the dealings among the parties (including nonparty Oren) as follows:

> [T]he parties intended that Oren and defendant would receive title immediately and give a mortgage secured by a promissory note for the installments. Oren was concerned about having his name appear on the deed due to outstanding tax debts, so a warranty deed, mortgage and promissory note were drawn up in defendant's name only. Plaintiff delivered the signed warranty deed to defendant, but defendant never signed the promissory note or the mortgage. Because defendant could not pay the property transfer tax that would be due on recording, [defendant] never recorded the warranty deed. Plaintiff testified that, at this time, he considered himself the mortgage holder only.

*Ante*, ¶ 4.

¶ 48. The above does not squarely describe a contract to make a deed. A contract to make a deed contemplates continued ownership of property by the seller, occupancy by the buyer, and a future transfer of the property by deed. See *Tromblay v. Dacres*, 135 Vt. 335, 339, 376 A.2d 753, 756 (1997) ("These agreements are entered into, in many instances, where the prospective purchaser cannot raise the difference between the price of the property and an acceptable mortgageable balance. The prospective purchaser occupies the premises and makes the payments until the point of delivery of the deed and execution of

the mortgage is reached."); *Prue v. Royer*, 2013 VT 12, ¶ 21, 193 Vt. 267, 67 A.3d 895. In this case, the parties did not contemplate some future transfer. Defendant paid a substantial sum of money — $41,793 — as a downpayment, plaintiff delivered a deed, and Oren, who at that time was aligned with defendant in connection with the purchase of the property, began paying the monthly mortgage payments toward the yet-to-be-executed mortgage. The amount of the purchase-money mortgage was agreed-upon and satisfactory to the parties. Plaintiff understood himself to be a mortgage-holder only, and received his $833 monthly payments in accordance with the unexecuted mortgage. Oren, with whom defendant was living in the house at the time, assumed the property tax and insurance payments — actions consistent with the understanding of the transaction as an actual conveyance of the property subject to a purchase-money mortgage, albeit an unexecuted mortgage likely to run up against significant Statute-of-Frauds issues.

¶ 49. Our ability to categorize these transactions is further complicated by the parties' shifting interpersonal relationships and the changes in their financial interactions that accompanied those. Within roughly a six-month period, Oren — an intended, but unnamed purchaser along with defendant — moved out, defendant and plaintiff became engaged in a relationship of sorts, plaintiff began paying the property taxes, and defendant, for the most part, stopped paying the agreed-upon mortgage payments. The trial court's findings do not offer much clue as to whether the changes in the parties' conduct with respect to the finances surrounding the property reflected a superseding agreement of some sort, a change in the parties' individual or collective under-standings of their respective obligations and rights, a breach of the existing agreement, an informal relaxation of plaintiff's expec-tations and defendant's obligations incident to their intimate relationship, or even outright forgiveness of defendant's obligations during the period of their relationship.[22]

¶ 50. In the face of the above record, I cannot conclude as a matter of law that the arrangement between the parties amounted to a contract to make a deed. I fully acknowledge that I would be

---

[22] Moreover, plaintiff's actual delivery of a deed to defendant alongside defendant's unsuccessful subsequent request to the trial court in 2009 to order plaintiff to deliver a deed to her adds an additional element of inscrutability to these transactions. See *ante*, ¶ 7 n.3.

hard pressed to find a more fitting legal label for the above circumstances. Colloquially, I would simply call them a mess. Rather than trying to fit them into a specific category, and then applying the specific equitable framework applicable to that category, I would apply general equitable principles to the analysis of defendant's unjust-enrichment claim.

¶ 51. Plaintiff's claim against defendant, as construed by the majority, is an equitable claim for payment. In evaluating plaintiff's unjust enrichment claim, we must determine "whether, in light of the totality of circumstances, it is against equity and good conscience to allow defendant to retain what is sought to be recovered." *Savage v. Walker*, 2009 VT 8, ¶ 8, 185 Vt. 603, 969 A.2d 121 (mem.) (quotation omitted). The majority acknowledges that defendant got the benefit of living on plaintiff's property without paying rent for the benefit, and that under the circumstances it would be unjust to allow defendant to keep that benefit. *Ante*, ¶ 22 (citing *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 41, 178 Vt. 244, 882 A.2d 1177). But that's only part of the story. Defendant was living on plaintiff's property in connection with some sort of agreement that ultimately fell through. In connection with that agreement, she personally paid plaintiff $41,793. That payment was part and parcel of the same transaction or set of transactions that gave defendant her occupancy of the home. The equitable balancing here requires consideration of the totality of the circumstances surrounding defendant's occupancy of the property and the associated agreements and understandings. See *Savage*, 2009 VT 8, ¶ 8 (inquiry requires " 'a realistic determination based on a broad view of the human setting involved,' rather than 'a limited inquiry confined to an isolated transaction.' ") (citation omitted); see also *Johnson v. Harwood*, 2008 VT 4, ¶ 15, 183 Vt. 157, 945 A.2d 875 (unjust enrichment inquiry requires consideration of "totality of the circumstances") (quotation omitted); *Gallipo*, 2005 VT 83, ¶ 41 (same). In this case, evaluation of the totality of the circumstances includes not only consideration of defendant's possession of the property free of charge for a period of time, but also recognition of the sizeable sum of cash defendant paid to plaintiff in connection with their deal-gone-awry. Cf. *Lalime v. Desbiens*, 115 Vt. 165, 55 A.2d 121 (1947) (affirming trial court's ruling in action in assumpsit offsetting defendant's obligation to plaintiff and plaintiff's obligation to defendant).

¶ 52. Even assuming that the parties here had a contract to make a deed, I could not join the majority's opinion. The majority

concludes that when a buyer enters into a contract for deed that is unenforceable due to the Statute of Frauds, that buyer acquires no equitable interest in the property by virtue of payments made toward the purchase as long as the seller remains willing and able to complete the sale. In so holding, the majority relies primarily on decisions of this Court from 1834, 1857, 1893, as well as the "nearly universal rule" reflected in the decisions of other courts. However, the majority's holding creates an illogical divergence between our case law relating to the rights of a defaulting purchaser in an executed contract for a deed and the rights of a defaulting purchaser in an oral, unexecuted contract for a deed.

¶ 53. It is no surprise that the prevailing majority rule denies a defaulting purchaser any equitable claim for unjust enrichment for return of purchase monies paid in the context of an unwritten contract for a deed; the majority rule in the context of *legally enforceable* contracts for a deed likewise denies such relief to a defaulting purchaser. However, in cases in which the purchasing party to a contract for a deed defaults, this Court has long departed from the majority rule that would deny that party any equitable interest in the subject property, no matter how much the party had paid toward the ultimate purchase price. See *Prue*, 2013 VT 12, ¶ 30 ("Although Vermont has consistently treated a contract for deed as an equitable mortgage, it has been one of only a small minority of states to do so."). In *Prue*, we reiterated that the defaulting purchaser in a contract for a deed builds an equitable interest in the property through regular payments pursuant to the contract, and is entitled to foreclose on that interest in the event of default — even the purchaser's own default. *Id.* ¶¶ 30, 51, 68. The rationale for this approach is based on the functional similarity between a transaction in which the seller holds the title and the purchaser pays down the purchase price, and a transaction in which the seller conveys title to the purchaser and holds a mortgage. *Id.* ¶ 29 (citing *Town of Weston v. Town of Landgrove*, 53 Vt. 375, 378 (1881)). The *equitable* interest of the purchaser arises from the act of making payments on the contract for a deed, and does not depend upon the *legal* enforceability of that contract. See *Tromblay*, 135 Vt. at 339, 376 A.2d at 756 ("Since the payments [pursuant to a contract for a deed] are applied to the purchase obligation as they accumulate, an equity, though perhaps small, comes into being. It is this interest that is referred to as the equitable mortgage interest that requires foreclosure.").

¶ 54. Given that Vermont has departed from the majority rule in connection with executed contracts for a deed, I see no rationale for adhering to the majority rule when a contract for a deed is unenforceable at law, and the majority does not provide one. As a leading commentator on the law of restitution has observed with respect to the availability of restitution claims for defaulting purchasers in the context of written and unwritten contracts: "[T]he two situations should be governed by a single rule, at least as to restitution of payments on the price." 2 G. Palmer, The Law of Restitution § 6.6, at 47 (1978). Although Palmer advocates a rule that denies restitution to defaulting purchasers in *both* contexts, he acknowledges that logic supports consistent treatment of defaulting purchasers in these parallel scenarios. The majority provides no rationale for forging disparate paths in the signed-contract and unsigned-contract situations. The nineteenth-century Vermont cases involving unenforceable contracts for a deed relied upon by the majority are outdated and unhelpful in the context of Vermont's modern divergence from the national pack on the parallel subject of enforceable contracts for a deed.[23] And, in contrast to Vermont's legal regime, the majority's holding in equity gives seller relief akin to strict foreclosure, and buyer no avenue to mitigate the harsh effects of strict foreclosure. See *Prue*, 2013 VT 12, ¶ 57 (foreclosure statute provides opportunities to avoid strict foreclosure). I would realign our case law in law and equity concerning contracts for a deed by recognizing the purchaser's equitable interest arising from purchase monies paid whether or not the underlying contract was legally enforceable.

¶ 55. Lastly, the majority acknowledges an exception to its general rule when the payments made toward the purchase price, on a percentage basis, are so high as to render the enrichment to seller unjust. *Ante*, ¶ 40. The majority applies this test by comparing the initial purchase money paid by defendant to the stated purchase price of the property and concluding that the ratio — 23.22% of the purchase price — was not so high as to render plaintiff's enrichment unjust.

---

[23] I acknowledge that one of the three unenforceable-contract cases cited by the majority post-dated this Court's statement concerning enforceable contracts in the *Town of Weston* decision. However, the Court's dicta in that case does not address the tension between the rule announced in the *Town of Weston* decision and the Court's previously articulated approach in the unenforceable-contract setting.

¶ 56. I disagree. Even without consideration of additional factors, $41,793 is a lot of money to most Vermonters, and represents nearly a quarter of the purchase price of the property. The majority's comparison of the applicable percentage to that in *Cobb* does not persuade me otherwise, as there is no indication in *Cobb* that the Court considered the argument here or affirmatively concluded that the sums paid (and lost) by the purchaser did not represent an unjustly high percentage of the purchase price. Moreover, in this case, a third factor comes into play: very significant payments toward the purchase price by a third party to this litigation. Although the agreed-upon purchase price in this case was identified as $180,000, at the time of the 2004 transaction, plaintiff credited the purchasers (defendant and Oren) with Oren's prior rental payments — a total of $39,486. Net of this credit, the actual sum due for the purchase of the property at the time of the 2004 transaction, was $140,514. Toward this sum, defendant paid $41,793, or around 30%. The balance due, to be secured by the unexecuted mortgage, was $98,720. From the summer of 2004 through around the end of 2007, Oren, who was aligned with defendant at that time, made monthly payments on the unexecuted promissory note. The trial court did not make findings as to the total payments made by Oren, but the 2009 judgment in the last round of litigation reflects that he made about 40 payments of $833, for a total of $33,320. It appears that the outstanding debt due to plaintiff on the property was closer to $65,401 — about a third of the original purchase price. From the perspective of plaintiff's windfall — he has received approximately two-thirds of the value of the property that the courts have now allowed him to keep without paying anyone back — the unjustness of the overall enrichment seems clear. I do not mean to suggest that defendant is entitled to be repaid for Oren's contributions, but the fact of these contributions, undertaken at a time when defendant and Oren were living together in the house and aligned vis-à-vis plaintiff, is a relevant consideration in the calculus concerning the unjustness of plaintiff's enrichment.

¶ 57. I concur in the majority's unjust-enrichment analysis concerning defendant's equitable obligation to plaintiff in connection with her occupancy of the property. Defendant was not entitled to live rent-free for a period of years while plaintiff waited for her to finish paying him for the purchase of the property, and the cost of the property taxes on the property is

one of the factors built into the determination of a reasonable monthly rent. And I concur in the majority's affirmance of the trial court's recognition of a credit in defendant's favor for certain improvements. But to the extent the Court treats defendant's $41,793 payment to plaintiff as a nonrecoverable investment, not to be considered in the overall equitable balance, I respectfully dissent.

¶ 58. I am authorized to state that Justice Burgess joins this concurrence and dissent.