*Robinson v. Robinson*, No. 93-2-14 Wncv (Teachout, J., June 26, 2015)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| Washington Unit | Docket # 93-2-14 Wncv |

GREG ROBINSON,
     **Plaintiff**

     **v.**

ASHLEY ROBINSON,
     **Defendant**

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter came before the Court for final hearing on the merits on June 9, 2015. Plaintiff is represented by Attorney Nicole A. Killoran. Defendant is represented by Attorney Edward A. Miller, Jr. Post-trial memoranda were filed.

The parties are father and daughter. Each claims compensation from the other for claims related to their interests in property in Calais.

### Findings of Fact

Plaintiff is the father of Defendant, his only child. Plaintiff is a handyman who makes his living by working for a variety of people. He generally charges $15–18 per hour. He has long lived in the home he grew up in, which was previously owned by his parents and then his father as survivor. It consists of a parcel of 1.75 acres and a dwelling house. His father made him joint owner in 2003, and he became sole owner when his father died. He lived alone on the property, which was subject to a mortgage incurred by his father. He approached the bank about refinancing, but was told that he could not do so due to poor credit, but he could simply continue to make the payments on his father's mortgage, and he did so. He fell behind in payment of property taxes. As of January 21, 2013, he owed $6,998.73 in delinquent property taxes and he received a letter from the Tax Collector inviting him to make a payment plan and if not done by February 28, 2013, tax sale proceedings would be initiated.

Shortly after he received the letter from the Tax Collector, his daughter, Defendant, needed a place to live, and Plaintiff invited her to live with him. They had discussions about the terms on which she would live there. The evidence is conflicting and shows that no clear agreement was reached between them as to terms, though there was a general understanding that she would "help out" with payment of property taxes. What actually happened was that she accompanied him to a meeting with the Tax

Collector, at which she agreed to make a significant payment toward delinquent taxes followed by monthly payments. Before making the first payment, she made arrangements for her father to see a lawyer about signing a deed. Plaintiff voluntarily wished to have the property go to her on his death as his father had done for him, and he testified credibly that he would have provided for that in any event, with or without her making payments for property taxes.

On March 1, 2013, Plaintiff signed a deed transferring a remainder interest in the property to Defendant and reserving for himself "a life estate giving him the right to live at the herein conveyed land and premises as long as Grantor [Plaintiff] so desires." The deed was recorded on March 25, 2013. Shortly thereafter, on March 28th, Defendant made a payment of $4,500.00 toward the delinquent property taxes. She testified credibly that she wanted to make sure the deed was done before she made the payment. She also began making regular payments toward the back taxes. She wished to make mortgage payments as well, but Plaintiff refused that offer, stating that that was his responsibility and he only wished to accept help with the property taxes as part of her living there. He continued to pay the mortgage himself, which was current.

It is not clear whether Defendant moved in before or after the deed and/or payment toward delinquent taxes, but at some point she moved in. She was there by April of 2013. She was not satisfied with the cleanliness or orderliness of the household, and began to clean things up to her standards. There is no evidence that Plaintiff objected.

Defendant did not understand correctly her ownership interest in the property as created by the deed. She believed that she was an owner with a *present*, as opposed to a future, interest in the property. Thus she believed that she had a right to live at the property and claim a right to possession. She did not have such a right, because her father alone held the life estate and retained sole right to exclusive possession of the property as long as he wished to have it. However, he also had the right to give her *permission* to live there with him, which he did.

The parties had some kind of argument or episode in July of 2013 and Plaintiff left for a few days. When he returned, he discovered that she had obtained a Relief from Abuse Order against him that prohibited him from entering the property. He left again, and she lived in the property alone. An Order of Relief from Abuse prohibiting him from the property remained in effect. In February of 2014, he filed this suit, seeking to eject Defendant from the premises. In July of 2014, at a hearing in Family Court regarding extension of the Relief from Abuse Order, Plaintiff voluntarily agreed that Plaintiff could remain in possession of the property pending resolution of the legal issues. In November of 2014, the Relief from Abuse Order ended. As a result of rulings in this case granting Plaintiff the right to exclusive possession based on his life estate, Partial Judgment and a Writ of Possession issued giving Plaintiff exclusive possession as of February 1, 2015. Defendant moved out at the end of January of 2015, and Plaintiff retook possession on February 2, 2015.

Plaintiff was out of the property for a total of 18 months. He acknowledges that for the last six months, Defendant's possession was based on his voluntary agreement. During the year that he was out based upon Defendant having obtained a Relief from Abuse Order excluding him, he lived or stayed at a variety of places on a temporary basis. He says he sometimes paid rent to friends he stayed with, but there is no evidence of amounts or months. He requests compensation of $500 per month for the value of living quarters he lost during the year he was excluded from possession. The monthly mortgage payment due was $222.38. As of September 1, 2013, the balance due on the mortgage was $9,913.06. The monthly property tax payments under the agreement with the Tax Collector were $275.00 per month; it cannot be determined from the evidence what the total 2013 property taxes were, nor a prorated monthly amount, but the sum of $500 per month represents a reasonable fair value for the value of comparable housing for that period. However, Plaintiff presented no evidence of actually having incurred any expense for housing during that year, and no specific facts about the terms of his living arrangements during the year he was excluded from the home without his consent. Plaintiff is entitled to a nominal amount for this claim in the absence of proof of specific damages.

During the period Defendant occupied the property, from July of 2013 through January of 2015, she continued to make monthly payments on the property taxes, usually making payments of either $300 or $1,000. By November 13, 2013, there were no delinquent taxes. She received the monthly mortgage statements, which were mailed to the house in the name of Plaintiff's father. She made payments on the mortgage in excess of the amount due, usually paying $300 and sometimes $500 instead of the $222.38 that was due. She wrote on many of the checks, "payment, rest principal."

Her boyfriend moved in with her. They made some repairs to the home, and they also undertook projects to improve the home. She has paid a total of $10,367 in property taxes and $6,100 in mortgage payments. Of the mortgage payments she made, $1,874.78 represent overpayments that would have been applied to reduce the principal balance. She claims $494.87 in repair costs, and $4,827.32 for the value of work done to improve the home. She claims that the property had greater value when she left than when she arrived. She is not making a claim for the value of the cleanup she did when Plaintiff lived in the home, before he was removed by the Relief from Abuse Order.

Plaintiff claims that when he returned to the property on February 2, 2015, Defendant had destroyed or converted some of his personal property, and had caused damages. Plaintiff claims $820 in property damages and $3,210 for loss of personal property. Defendant acknowledges a few of the items of damage claimed.

The evidence demonstrates that Defendant took over the property and its contents and expected to make it her permanent residence to the exclusion of Plaintiff. She believed that the Relief from Abuse Order in addition to the deed (which she misunderstood) were sufficient to give her sole legal entitlement to the property. Her actions demonstrate that she was asserting exclusive right of possession and did not protect and preserve Plaintiff's personal possessions or control over the residence.

3

When Plaintiff returned, some of his possessions, including his bed, had been burned in a new burn pile, and many are missing. Defendant's voluntary acceleration of paying off the principal of the mortgage, as well as her payment of property taxes, are evidence of an exclusive ownership intent. This is corroborated by the manner in which she took over the residence. During the 18 months she was there, she did not just maintain personal housekeeping standards and undertake maintenance, but she made changes to the property: she closed off the garage door leading to the basement and insulated it; she removed a window in the basement and converted it into a chute for wood; she began laying a new floor (the work was left unfinished); painted the bathrooms, stained the deck, and did work on the roof and electrical system. She testified credibly that she would not have undertaken that work if she had known that she would have to move, and she stopped when she learned she would have to vacate the property.

Defendant and her boyfriend kept pigs in a shed on the property while they were there, and slaughtered them two days before they left, leaving the fresh carcasses and other remains of slaughtered pigs in the basement to be cleaned up.

As to Plaintiff's claim for damages when he returned, the Court finds credible Plaintiff's evidence of all of the damages caused by Defendant during her residency and also finds credible Plaintiff's evidence about the costs of repair and cleanup, which total $820.00 as listed on Plaintiff's Exhibit 2 and shown by the photographs in Plaintiff's Exhibit 3.

As to Plaintiff's claim for personal property lost, there was no credible testimony to support replacement value of many of the items claimed, although there was evidence that Plaintiff's bed and other items were burned in a burn pile. The item most specifically discussed was the lawn mower. Plaintiff's testimony that there were two when he left and only one when he returned is credible. His testimony was that the current value of the one that is missing is $1,500; he based that on what he paid for it several years ago and thus the testimony is not credible. Taking all of the evidence into account, the court finds that Defendant destroyed or removed personal property items that Plaintiff used for daily living, such as his bed and tools he used as a handyman, but the exact value cannot be determined. In addition she made alterations to the residence which Plaintiff had to reverse when he moved back in (basement door and window; pig feces in shed). While the value is not quantified, Plaintiff is entitled to some amount in recognition of this form of damage.

As to Defendant's claim of $494.87 in repair costs, Defendant claims $77.55 for paint, $100 for furnace cleaning and tune-up, and $317.32 to replace a door and install new locks. These items represent discretionary choices (paint, new locks) or regular maintenance related to use (furnace cleaning) undertaken by a resident during a period of use. They were not requested by Plaintiff nor is there any evidence that they have enhanced value in any way.

As to Defendant's claim for expenditures made to improve the value of the home, there is no evidence of increased property value attributable to the expenses or work performed.


## Conclusions of Law

Prior to trial, Plaintiff's right to a life estate was established and he was returned to possession. This case then boiled down to the parties' competing claims for damages. Plaintiff seeks damages for the wrongful ouster and alternative housing expenses, for harm to the house, and for harm to or loss of his personal property. Defendant seeks damages for unjust enrichment for repairs and improvements to the house, and taxes and mortgage payments.

As a general matter, the holder of a life estate has a right to seek damages from one who interferes with the right to exclusive possession. Those damages may include loss of the use of the property as well as "compensation for any associated damages reasonably flowing from" the ouster. *In re Estate of Hodgkins*, 807 A.2d 626, 631 (Me. 2002). Plaintiff has proven damages of $820 for damage to the house and repair and cleanup expenses flowing from the ouster. He has proven that he had to make alternative living arrangements during that time as well and incurred some expense to do so, though he provided no reliable evidence as to amounts. He also has proven substantial damages for the loss or destruction of personal property, such as his tractor, tools, and bed. Again, however, the evidence fell short of enabling the court to calculate these damages with precision.

The court declines to award Defendant any damages for repairs or improvements to the residence, or for property taxes or required monthly mortgage payment amounts. Defendant voluntarily incurred these expenses after wrongfully ousting Plaintiff from his home. Other than the claimed improvements, these are the routine expenses incurred by one in possession of a home. Catching up on the delinquent property taxes also helped to protect Defendant's remainder interest, as it avoided a tax sale.

The claim for improvements fails because, among other things, there was no reliable evidence that any such improvements increased the value of the home. See *Massey v. Hrostek*, 2009 Vt 70, ¶ 23, 186 Vt. 211. Finally, even if the Defendant had a possessory right, which she did not, "the cotenant who excludes his cotenants from possession and enjoyment of the . . . property is not entitled to credit for costs incurred, for either maintenance *or* improvements, during the period of the ouster." *Id*. ¶ 25 (emphasis in original).

The analysis is different with regard to Defendant's claim for damages in the amount of her overpayments on the mortgage. These payments were not necessary housing expenses and were made solely for the purpose of reducing the principal on the loan. Plaintiff has retained the benefit and will enjoy it in fact when the loan is paid off sooner than it otherwise would have been. "Under the doctrine of unjust enrichment, a

5

party who receives a benefit must return the [benefit] if retention would be inequitable. Unjust enrichment applies if 'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." *Kellogg v. Shushereba*, 194 Vt. 446, ¶ 22, 194 Vt. 446 (quoting *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 41, 178 Vt. 244). The value of the mortgage overpayment, $1,874.78, in all fairness should be credited to Defendant.

Plaintiff thus has proven $820 in damages for damage to the house and repair and cleanup expenses, plus he is entitled to some amount of damages in recognition of his loss of use of property during the ouster and an equitable award for lost or damaged personal property. Defendant has shown grounds for a credit of $1,874.78 for the value of overpayments on the mortgage. The court concludes that reasonable amounts attributable to loss of use of property and lost or damaged personal property are at least $1,054.78, the difference between $820 and $1,874.78, and awards that amount to Plaintiff.

The result is that the damages awards net out in set-off; neither Plaintiff nor Defendant is entitled to a judgment for damages.

## ORDER

Counsel for Plaintiff shall submit a form of judgment.

Dated at Montpelier, Vermont this _____ day of June 2015.

_____
Mary Miles Teachout
Superior Judge