Filed 01/30/24

VERMONT SUPERIOR COURT
Grand Isle Unit
PO Box 7
North Hero VT 05474
802-372-8350
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 30-5-19 Gicv

---

Falcao vs. Richardson

---

## FINDINGS, CONCLUSIONS, AND ORDER

The parties tried this case to the court over three days in the summer and fall of 2023. After the conclusion of the evidence, the court invited post-trial submissions. Both parties submitted proposed findings of fact and conclusions of law. Now having reviewed the evidence along with those submissions, the court makes the following findings and conclusions, all by a preponderance of the credible evidence.

## FINDINGS

Plaintiff Joan Falcao and her domestic partner, Counterclaim Defendant Robert Fireovid, are the principals of Counterclaim Defendant Health Hero Farm LLC. The LLC, in turn, owns a beef farm in South Hero. Ms. Falcao and Mr. Fireovid purchased the farm and set up the LLC in partnership with a local family, the Noels, with farming experience. It was this partnership—and specifically, the Noels' farming experience—that allowed the LLC to purchase the property in 2013 from the Vermont Land Trust ("VLT"), with VLT retaining a conservation easement on the property, as well as an option to purchase at agricultural value ("OPAV"). To this partnership, Ms. Falcao and Mr. Fireovid brought the capital—they loaned the Noels the funds for their capital contribution—and the Noels brought both farming expertise and labor.

In 2016, the partnership between Ms. Falcao and Mr. Fireovid and the Noels had begun to fray, and they were looking for a way to buy the Noels out. Eventually, they were able to reach agreement. In March 2017, Ms. Falcao and Mr. Fireovid became sole owners of the LLC and underlying farm property.

Along the way, Ms. Falcao and Mr. Fireovid had met and become friends with Defendant Mitchell Richardson. Mr. Richardson owned a local auto repair shop; he also ran beef cattle on his farm on South Hero. The parties discovered their mutual interest in raising beef, and began to collaborate informally. They attended seminars together on grass farming and bovine genetics, and

Findings, conclusions, and Order
30-5-19 Gicv Falcao vs. Richardson

Page **1** of **6**

worked together as Mr. Richardson worked to upgrade his pastures to provide better forage for his cattle.

As Ms. Falcao and Mr. Fireovid were looking for a way to buy out the Noels, Ms. Falcao began discussing with Mr. Richardson the possibility of a partnership on the farm. It is important to note that these discussions never progressed to the point of agreement; indeed the parameters of any prospective partnership remain fuzzy to this day. Nevertheless, Ms. Falcao represented to the outside world, including, importantly, VLT, that with the departure of the Noels, she and Mr. Fireovid were partnering with Mr. Richardson in various aspects of farm operations. These representations were critical; Ms. Falcao and Mr. Fireovid were concerned that VLT would not sign off on their buyout of the Noels without some assurance that they would be replacing the Noels' farming expertise and labor with someone who could make similar contributions.

At the same time, the parties' shared interest in improving genetics and production in their herds led Mr. Richardson to explore the purchase of Galloway cattle. The idea to explore Galloways came initially from Ms. Falcao; Mr. Noel had had Galloways on his farm in the Northeast Kingdom, and they had white coats which he felt helped them weather the summer heat. Mr. Richardson included Ms. Falcao and Mr. Fireovid in his explorations, and they endorsed his plans. When he went to Canada to look at Galloway heifers, he sought Ms. Falcao's concurrence on the choice of animals to purchase, and she gave her consent; she also agreed to advance funds for purchase of the cattle, and told Mr. Richardson to get an invoice before she transferred any funds. Ultimately, she wired $16,000.00 to the breeder for this purpose.

The terms of the parties' agreement with respect to this transfer of funds lie at the heart of this dispute. Ms. Falcao was insistent upon a written agreement; she first proposed an arrangement pursuant to which she and Mr. Fireovid would purchase the cattle and board them at Health Hero Farm until Mr. Richardson reimbursed them for the purchase price and expenses of their boarding. This proposal also called for the parties to share farming resources, including labor and equipment, between their respective farms. When Mr. Richardson did not accept this proposal, she proposed a simple promissory note, the terms of which do not appear. Mr. Richardson did not agree to this either; he told Ms. Falcao that he was a Vermonter, who preferred a handshake agreement. Finally, on January 9, 2017, Mr. Richardson stopped by Health Hero Farm on the way to Canada to pick up the cattle. Ms. Falcao handed him a stack of papers, including what turned out to be the promissory note that underlies this case, and insisted that he sign them. Mr. Richardson signed all, without reading any of

them. When Ms. Falcao asked if he was going to read the papers, he responded, in sum and substance, "why would I; I trust you. Don't you trust me?"

This proves to have been a prophetic question. While much of the contents of the note are uncontroversial, it contains a provision allowing recovery of attorney's fees. Importantly, at no time during the conversations leading up to the creation and signing of the note did Ms. Falcao suggest, or Mr. Richardson agree, that attorney's fees would be a part of any arrangement between them. Indeed, such a suggestion would have run completely contrary to the course of informal, friendly cooperation and collaboration between the parties.

When Mr. Richardson returned from Canada with the Galloways, he delivered them to Health Hero Farm. Ms. Falcao and Mr. Fireovid represented to the Noels that they, and not Mr. Richardson, had purchased the Galloways. At the same time, as noted above, they represented to the South Hero Land Trust, Vermont Land Trust, and others that the Galloways were a joint project with Mr. Richardson—part of a poorly defined partnership working together in multiple aspects of farm operations. These representations evidently had the desired effect, because VLT then waived the OPAV to allow Ms. Falcao and Mr. Fireovid to become sole owners of Health Hero Farm, even though they did not meet VLT's requirement that they be "farmers."

Following Ms. Falcao and Mr. Fireovid's acquisition of the Noels' interest in Health Hero Farm, the parties continued to work together in a loosely defined collaborative relationship. Ms. Falcao and Mr. Fireovid continued from time to time to hold Mr. Richardson out as their partner in one aspect or another of farm operations. Eventually, Mr. Richardson moved his entire herd to Health Hero Farm, where they joined the Galloways. Mr. Richardson did work on the farm, with no expectation of recompense. This included substantial excavation work on various projects for the benefit of the farm; he also left his excavator on the farm, with the understanding that Ms. Falcao and Mr. Fireovid could use it with no obligation except to pay for fuel. For their part, besides allowing the Galloways and Mr. Richardson's herd to be kept at the farm, Ms. Falcao and Mr. Fireovid provided feed and other needs for the Galloways; they also arranged for and paid for veterinary services. Off the farm, the parties jointly hayed various leased properties; the invoices were sent to Health Hero Farm.

While this may not be a compete catalog of the exchange of efforts and value between the parties, it fairly captures the essence of what was a reciprocal, voluntary exchange between friends and neighbors. Importantly, neither side suggested to the other any expectation of compensation. Rather, each party's contribution was voluntary, made in the spirit of neighborly friendship and cooperation,

and with the hope, if not the expectation, that their informal partnership would mature into a formal arrangement.

Throughout this all, the parties continued to explore the possibility of a formal partnership. They were never able, however, to reach agreement. By the end of the summer of 2017, it became clear that Mr. Richardson wanted much more in a partnership—ultimately, an ownership interest in the farm—than at least Ms. Falcao was willing to give. When this finally became clear to him, he metaphorically picked up his toys and went home—except he left some of those toys, the cattle, behind. After some back and forth, Ms. Falcao and Mr. Fireovid made arrangements to have the cattle, including the Galloways, transported to Mr. Richardson's farm. Mr. Richardson came to Health Hero Farm to assist in loading the cattle for transport back to his farm. At this point, the relationship between the parties effectively ended. The Galloways remain in Mr. Richardson's possession.

After the fact, Mr. Fireovid prepared a series of "accountings," purporting to allocate costs and expenses that theretofore had been shared between the parties. It is not clear whether and how Ms. Falcao and Mr. Fireovid shared any of these with Mr. Richardson; it is clear, however, that he never agreed to them. It is also clear that there was never any agreement that any of the costs shown on these exhibits were to be allocated to either party; instead, as related above, the parties worked at all times in a loose collaborative partnership, giving and taking without counting the cost. Notably, the "accountings" omit the funds Ms. Falcao advanced for the purchase of the Galloways, and the value of Mr. Richardson's excavation work on Health Hero Farm. Including those contributions to the picture, it is clear that Ms. Falcao, Mr. Fireovid, and their LLC got far more out of the relationship than did Mr. Richardson. It is also clear, however, that neither side entered the relationship expecting to count costs; that is an effort that has occurred only in hindsight.

## CONCLUSIONS

While the foregoing narrative is by no means a completely detailed recitation of the parties' relationship, it sufficiently captures the nature of the relationship. To speak in metaphors, the parties started out as platonic friends, while Ms. Falcao and Mr. Fireovid were in a committed relationship with the Noels. As that relationship deteriorated, the parties began to explore a more serious relationship. That relationship quickly progressed to a form of "friends with benefits," in which each side derived benefit from the other with no expectation of compensation but with the hope, if not the promise, that the relationship would mature into something more serious and permanent. Along the way, they gave each other gifts: feed, hay, labor, excavation services, and the like. These, however, were not gifts made as part of a promise to marry, but instead were freely given with no strings

attached. *Cf. Nystrom v. Hafford*, 2012 VT 60, ¶ 12, 192 Vt. 300 (affirming trial court's determination that conveyance of interest in real estate was not gift in contemplation of marriage, and so subject to recission). Ultimately, as happens in many relationships, Mr. Richardson wanted more than Ms. Falcao and Mr. Fireovid were willing to give, and they broke up. Mr. Richardson can be forgiven for believing that he was being strung along, and taken advantage of; in hindsight, it is clear that Ms. Falcao was never going to give him what he wanted, but nevertheless allowed him to believe that it was a possibility as long as it suited her purposes.

Also along the way, as many couples do, the parties here acquired pets—the Galloways. While they never reached formal agreement as to ownership, they represented to the world that the pets were jointly owned. And while Mr. Richardson signed a note, the court cannot conclude that that note accurately reflected an agreement between him and Ms. Falcao. Rather, the surrounding circumstances make clear that the note was a contract of adhesion, presented to Mr. Richardson in a sheaf of papers by one in a clearly stronger negotiating position. There is no evidence of any discussion of the terms of the note—particularly the attorney's fees provision—much less agreement to those terms. Nor can the court conclude that the parties ever entered into a legally enforceable joint venture agreement with respect to the Galloways.

Thus, the parties' remedies, if any, lie in equity—specifically, the doctrine of unjust enrichment.

> Unjust enrichment is 'based on an implied promise to pay when a party receives a benefit and the retention of the benefit would be inequitable.' [Citation omitted.] Recovery under this theory depends on 'whether, in light of the totality of circumstances, it is against equity and good conscience to allow defendant to retain what is sought to be recovered.' [Citation omitted.]

*Kwon v. Edson*, 2019 VT 59, ¶ 27, 210 Vt. 557. To recover under this theory, a claimant must show (1) that he or she conferred a benefit on the other party, (2) that the other party accepted the benefit, and (3) that the other party "retained the benefit under such circumstances that it would be inequitable for [the other party] not to compensate [claimant] for its value." *Kellogg v. Shushereba*, 2013 VT 76, ¶ 31, 194 Vt. 446.

Here, the findings above make clear that for the bulk of the goods and services exchanged between and among the parties, this showing fails. While each side conferred benefits on the other, and the other freely accepted the benefits, the circumstances of these exchanges were not such as would make it inequitable for the receiving party to retain the benefit without compensating the giver. Instead, to continue the metaphor above, parties in an uncommitted relationship frequently exchange

gifts, buy each other meals, and help each other out in little and big ways, with no accounting to make sure the exchange of favors is fair, and no expectation of anything in return but the pleasure of each other's company. So too here, for all the work and materials the parties shared on each other's farms. The same cannot be said, however, for the Galloways. Whether Ms. Falcao's advance of $16,000 was a loan or her initial contribution to a joint purchase, it was never anyone's contemplation that Mr. Richardson would end up owning the Galloways without compensating her for that contribution. Thus, the court concludes that Ms. Falcao is entitled to an award of damages against Mr. Richardson in the amount of $16,000.00. While Ms. Falcao did not introduce evidence as to the date when she first made demand for this amount, her damages were reasonably certain no later than the date on which she initiated this proceeding. Accordingly, the court concludes that she is entitled to interest at the statutory rate from May 17, 2019. *See EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 36, 181 Vt. 513 ("Prejudgment interest is awarded as of right when damages are liquidated or reasonably certain.").

Finally, the court rejects both parties' Prompt Pay Act claim for services they claim to have performed as contractors to each other. These claims fail for multiple reasons, the most fundamental of which is that neither side ever contracted with the other to do anything. *See* 9 V.S.A. § 4001(1) (defining "contractor"). Equally, the work Ms. Falcao and Mr. Fireovid claim to have performed for Mr. Richardson does not qualify as "work" within the meaning of the Prompt Pay Act. *Id.*, § 4001(2). And while at least some of Mr. Richardson's excavation work on Health Hero Farm may meet that definition, his failure to prove that he ever submitted an invoice for that work is an independent basis for rejecting his claim. Because each side is the prevailing party on the other's Prompt Pay Act claim, the court concludes that neither is entitled to recover attorney's fees. *See* 9 V.S.A. § 4007(c).

## ORDER

The clerk will enter judgment for Ms. Falcao for damages in the amount of $16,000.00, plus prejudgment interest through January 25, 2024 in the amount of $9,010.85, for a total judgment of $25,010.85. In all other respects, the court denies the parties' claims.

Electronically signed pursuant to V.R.E.F. 9(d): 1/29/2024 3:03 PM

_____
Samuel Hoar, Jr.
Superior Court Judge

_____
Sherri Potvin
Assistant Judge

_____
Joanne Batchelder
Assistant Judge

Findings, conclusions, and Order
30-5-19 Gicv Falcao vs. Richardson

Page **6** of **6**